UNITED STATES of America, Plaintiff,

The Walker River Paiute Tribe of Nevada and Robert Benton et al., Plaintiffs-Appellants,

v.

SOUTHERN PACIFIC TRANSPORTATION COMPANY et al., Defendants-Appellees.

UNITED STATES of America, Plaintiff-Appellant,

v.

SOUTHERN PACIFIC TRANSPORTATION COMPANY et al., Defendants-Appellees.

Nos. 74–3333, 75–1080.

United States Court of Appeals, Ninth Circuit.

Sept. 10, 1976.

**680**

Yvonne T. Knight and Daniel H. Israel (both argued), of Native American Rights Fund, Boulder, Colo., for appellants in 74–3333, for appellees in 75–1080.

John Zimmerman, Atty. (argued), of U. S. Dept. of Justice, Washington, D. C., for appellant in 75–1080.

Donald Oakley Roy (argued), of Kentfield, Cal., for appellees in 74–3333.

Before GOODWIN and WALLACE, Circuit Judges, and WILLIAMS,* District Judge.

WALLACE, Circuit Judge:

This case arises out of a confrontation between the "manifest destiny" of the westward movement of American civilization and the rights of the native American Indians to their lands. It raises important issues of Indian law and requires the interpretation of a century of Indian and public land policy.

The Southern Pacific Transportation Company (Southern Pacific) operates a railway through the reservation of the Walker River Paiute Tribe of Nevada (Tribe). The right-of-way has been used continuously by Southern Pacific and its predecessors since 1882. It is now alleged that the railway is and has always been a trespasser.[1]

The Tribe and a class of individual allottees[2] of land traversed by the railway brought suit seeking, among other things, a declaration that the 1880 and 1882 agreements granting Southern Pacific's predecessor the right-of-way are void and that the Indians own the right-of-way, a permanent injunction against future trespass, money damages for trespass and punitive damages. The United States instituted a second suit in its own right and on behalf of the Tribe and allottees seeking to quiet title to the right-of-way in the United States for their use and benefit, ejectment,[3] and damages for trespass. The district court ordered the two actions consolidated. The theory of both suits was that Southern Pacific and its predecessors never obtained a valid right-of-way through the reservation.

■ The district court granted a partial summary judgment for the Indians and the United States. It ruled that Southern Pacific did not have a valid easement for the railway or adjoining telephone and telegraph lines but that it did have a license for a railway from the time the railroad was constructed in 1882 to the filing of the complaint in this suit.[4] The trial judge certified the partial summary judgment as appealable pursuant to 28 U.S.C. § 1292(b). The Tribe and allottees and the United States appealed and we exercised our dis-

---

* Honorable David W. Williams, United States District Judge, Central District of California, sitting by designation.

1. These claims are not barred by the applicable statute of limitations. 28 U.S.C. § 2415; *Capitan Grande Band of Mission Indians v. Helix Irrigation District*, 514 F.2d 465 (9th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975).

2. The class was certified under Rule 23(b)(1)(B), Fed.R.Civ.P. The class consists of all original allottees and their successors in interest who do not have patents.

3. While the motion for partial summary judgment was pending, the United States filed an amended complaint which omitted the allegations and prayer that the railroad be removed.

This change of position by the government concerns us. We cannot be oblivious to the fact that this railroad line services a United States Navy munitions depot. Whether the Justice Department can represent the claims of the Tribe and allottees without a conflict of interest should be examined by the district court on remand.

4. The trial judge held that there was a genuine issue of fact as to whether the license extended to the telephone and telegraph lines. He made no findings on damages for the period after the filing of the complaints and before the entry of judgment or on the propriety of an injunction, ejectment or other relief. These issues were reserved for trial.

cretion to entertain the appeals.[5] We reverse the decision on the claims of the class of allottees and remand with directions to dismiss for lack of jurisdiction unless an alternate ground for jurisdiction can be found. We affirm in part and reverse in part the holding that Southern Pacific never acquired an easement, and reverse the finding that it had a license.

## I. Factual and Procedural Background

The Walker River Reservation was formally established by executive order of President Grant on March 19, 1874.[6] On April 13, 1880, in consideration of the payment of $750 and a promise of free transportation for the Indians and their products along the railway as long as the railroad is operated through the reservation, a special council of the Tribe orally granted D. O. Mills and Associates, later incorporated as the Carson & Colorado Railroad Company, a right-of-way through the reservation. On January 5, 1881, the Carson & Colorado filed maps of definite location with the Department of the Interior seeking thereby to obtain a right-of-way under the General Railroad Right of Way Act of 1875, ch. 152, 18 Stat. 482 (codified at 43 U.S.C. §§ 934–39) (hereinafter referred to as "1875 Act"). These maps were approved by the Secretary on January 29, 1881. The railroad was actually constructed in 1881 and 1882.

On August 9, 1882, the Carson & Colorado entered into a written agreement with the "chiefs, headmen and heads of a majority of families" of the Tribe. Although reciting that the Carson & Colorado believed that "it had honestly and in good faith complied with all legal requirements" for obtaining a right-of-way across the reservation, the agreement granted a right-of-way for the railroad "as now constructed" in consideration of the payment of $750, a promise of free transportation, and certain additional promises. The agreement was expressly made subject to final ratification by Congress. Although four bills were introduced for that purpose, Congress never ratified the agreement.

In 1902 Congress acted to enable part of the reservation to be opened to settlement. By a series of statutes and an agreement allotments of irrigable lands and cash payments were made to individual Indians, tribal grazing and timber lands were set aside and the Indians "cede[d] . . . and relinquish[ed] to the United States all right, title and interest" to the remaining lands in the reservation. In 1906 the relinquished lands were opened by presidential proclamation to settlement "subject to disposal under the existing laws of the United States.[7] In 1925 the Central Pacific Railway Company (successor to the Carson & Colorado and predecessor of Southern Pacific) filed amended maps of definite location with the Department of the Interior for the stated purpose of obtaining the benefits of the 1875 Act. These maps were approved in 1926. Part of the ceded lands were restored to the reservation in 1936.

---

**5.** The district judge originally found no just reason for delay and directed that a final judgment be entered pursuant to Rule 54(b), Fed.R. Civ.P. All of the parties then appealed, asserting appellate jurisdiction under 28 U.S.C. § 1291. Since the district court had in effect decided only the issue of liability on the trespass claims, without deciding what relief would be appropriate, the judgment was not final as to one entire claim and therefore not appealable under 28 U.S.C. § 1291. *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). We ordered the appeals dismissed unless the district judge certified the appeals under 28 U.S.C. § 1292(b). He did so and we now have appellate jurisdiction.

All of the issues raised by the prior appeals of the Tribe and allottees, of the United States

and of Southern Pacific are now before us. As we interpret the district judge's order, the issues that should be decided now are the same as those which were before us on the initial appeals. In addition, it is necessary to decide the issues raised by Southern Pacific in order properly to dispose of the issues raised in these appeals by the Tribe and allottees and the United States.

**6.** 1 C. Kappler, Indian Affairs: Laws and Treaties 869 (2d ed. 1904). We have held that the reservation was actually established by administrative action in 1859. *United States v. Walker River Irrigation Dist.*, 104 F.2d 334, 338 (9th Cir. 1939).

**7.** See p. 693 *infra*.

The trespass claims of the Tribe and allottees and the United States relate to 50.47 miles of Southern Pacific's railroad line. This challenged segment represents the part of the line within the original 1874 executive order reservation boundaries. After the 1906 cession and allotments, 25.72 miles of the line crossed ceded lands, 17.75 miles traversed tribal lands and 7.0 miles intersected allotted lands. Lands containing 13.25 miles of line were restored to the Tribe in 1936.

## II. Jurisdiction of the District Court

The district court had jurisdiction over the Tribe's claims pursuant to 28 U.S.C. § 1362 and over the claims of the United States pursuant to 28 U.S.C. § 1345. Neither statute requires any minimum amount in controversy.

■ The district court found that it had jurisdiction over the claims of the class of allottees pursuant to 28 U.S.C. § 1331, which requires that the amount in controversy exceed $10,000. The complaint alleged that the amount in controversy exceeded $10,000 "per plaintiff," but Southern Pacific challenged this allegation in its opposition to the plaintiffs' motion for summary judgment. This challenge was timely, Fed.R.Civ.P. 12(h)(3), and shifted the burden to the allottees to show that it does not appear to a legal certainty that their claims are for less than the required amount. *Gibbs v. Buck,* 307 U.S. 66, 72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); *Saint Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

■ The district court did not find that the claim of each allottee exceeds $10,000, but instead held that the allottees' claims could be aggregated and sustained jurisdiction on the ground that it did not appear to a legal certainty that the total claim of the class did not exceed $10,000. Southern Pacific has not challenged this holding on appeal, but we are bound to consider jurisdictional defects sua sponte. *Mansfield, C. & L.M. Ry. v. Swan,* 111 U.S. 379, 384, 4 S.Ct. 510, 28 L.Ed. 462 (1884). We conclude that the district court erred in aggregating the allottees' claims to determine whether the jurisdictional amount requirement was met. The claims of the class of allottees must therefore be dismissed unless it appears to the district court on remand that there is no legal certainty that the claim of *each* allottee does not exceed $10,000 or unless some alternative jurisdictional basis can be found.

■ Class members may aggregate their claims to satisfy the amount in controversy requirement only where their claims are "joint and common" and not "separate and distinct." *Zahn v. International Paper Co.,* 414 U.S. 291, 293–94, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Snyder v. Harris,* 394 U.S. 332, 336–37, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). The district court aggregated the allottees' claims solely on the authority of *Skokomish Indian Tribe v. France,* 269 F.2d 555 (9th Cir. 1959). The Skokomish Tribe claimed certain tidelands under a treaty and executive order. The Tribe brought a trespass and quiet title action against a number of defendants who claimed adverse interests in the lands. Jurisdiction was asserted under 28 U.S.C. § 1331.[8] The complaint alleged that the jurisdictional amount requirement was met but there was no allegation that the requirement was met as to each defendant. We concluded that the claims against the various defendants could be aggregated and that the district court had jurisdiction. We said that all the defendants derived their title from a common source and that "while the land in question is divided into parcels, it comprises essentially a single tract . . . ." 269 F.2d at 559.

■ From our opinion, it is not clear what factors led us to our conclusion that the land comprised "essentially a single tract" and inferentially that the claimants to the separate parcels would be jointly

8. 28 U.S.C. § 1362, which would have provided jurisdiction without regard to amount in controversy for a suit by an Indian Tribe, was not enacted until 1966. Act of October 10, 1966, Pub.L.No. 89–635, § 1, 80 Stat. 880.

liable to the Tribe.[9] But whatever factors may have dictated that conclusion are clearly not involved here. Our case is controlled by *Potrero Hill Community Action Committee v. Housing Authority,* 410 F.2d 974 (9th Cir. 1969). There, a class of tenants in a federally-financed, low-rent housing project sought a judgment directing local authorities to make improvements allegedly required by terms of the tenants' leases and of the financing agreement with the federal government. Jurisdiction was asserted under 28 U.S.C. § 1331, but the minimum amount in controversy requirement could be satisfied only if the claims of the individual tenants could be aggregated. We said that aggregation is proper only if the tenants' claims "derive from rights which they hold in group status." 410 F.2d at 978. In spite of the common questions of law and fact involved, we then concluded that "their rights appear to arise only from the status of each as individual lessee of a portion of the project," *id.,* and therefore the claims could not be aggregated. *See also City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 953 (9th Cir. 1972); *Alfonso v. Hillsborough County Aviation Authority,* 308 F.2d 724, 726–27 (5th Cir. 1962).

This analysis produces a similar result here. Although the allottees' claims present common questions of law and fact, their rights to exclude trespassers are not held in any group status. Allotments of tribal lands are made to the individual Indians "in severalty" and "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made . . . ." General Indian Allotment Act of 1887 (Dawes Act), ch. 119, §§ 1, 5, 24 Stat. 388–89 (codified at 25 U.S.C. §§ 331, 348). The primary purpose of the allotment policy was to break up tribal life and encourage Indians to live independently on their own individual lands.[10] Each allottee has the "full possessory right" to his allotment, which becomes an absolute right of ownership when the trust period expires and fee patents are issued. F. Cohen, Handbook of Federal Indian Law 220 (Univ. of N.M. Press reprint of 1942 ed.). Thus we conclude that, as in *Potrero Hill,* the allottees' rights "arise only from the status of each as individual [allottee] of a portion of the [reservation]" and their claims cannot be aggregated for purposes of satisfying the jurisdictional amount.

The allottees argued in the district court that aggregation of their claims should be permitted under a less technical approach adopted by other courts. *See, e. g., Berman v. Narragansett Racing Association,* 414 F.2d 311 (1st Cir. 1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970); *Bass v. Rockefeller,* 331 F.Supp. 945 (S.D.N.Y.), *vacated as moot,* 464 F.2d 1300 (2d Cir. 1971). To whatever extent those decisions would produce a different result here, however, we conclude that they are contrary to Supreme Court decisions that "separate and distinct" claims may not be aggregated, *Zahn v. International Paper Co., supra; Snyder v. Harris, supra,* and to the *Potrero Hill* decision in our circuit.[11]

---

**9.** The test for aggregating claims of one plaintiff against multiple defendants is essentially the same as that for aggregating claims of multiple plaintiffs against one defendant: the plaintiff's claims against the defendants must be common and undivided so that the defendants' liability is joint and not several. *Walter v. Northeastern R.R.,* 147 U.S. 370, 373–74, 13 S.Ct. 348, 37 L.Ed. 206 (1893); 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3704, at 417 (1976).

**10.** *See* D. Otis, The Dawes Act and the Allotment of Indian Lands 9–10 (1973), *reprinted with minor changes from Hearings on H.R. 7902 Before the House Committee on Indian*

*Affairs,* 73d Cong., 2d Sess., pt. 9, at 428–89 (1934).

**11.** There is also an argument that the rule of *Zahn* and *Snyder* should be limited to class actions maintained under Rule 23(b)(3), Fed.R. Civ.P., and that any class action meeting the more stringent requirements of Rules 23(b)(1) or (b)(2) should automatically qualify for aggregation. *See* 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3705, at 442–44 (1976). The authors note, however, that there is "little hope" for this argument to prevail in light of the Court's "unswerving adherence" in *Zahn* and *Snyder* to the traditional rule. *Id.* at 442. We implicitly rejected the argument in *Potrero Hill* by holding that claims

■ Thus we conclude that the district court erred in holding that the allottees' claims could be aggregated for purposes of satisfying the jurisdictional amount requirement. We therefore reverse the decision as to the claims of the allottees and remand with directions to dismiss unless the district court concludes that there is not a legal certainty that the claim of each allottee does not exceed $10,000 or unless jurisdiction exists pursuant to some other statute which does not require a minimum amount in controversy.[12]

III.  The Contentions of the Parties

The Tribe and the United States object to the district court's conclusion that Southern Pacific and its predecessors enjoyed a license and that until its revocation by the filing of the complaint in this case, it had a right to have its railway run through the reservation. However, whether Southern Pacific had a license is immaterial if it in fact had a valid easement and so we are first called upon to discuss that issue.

■ All parties agree that Southern Pacific did not obtain a valid easement for a railroad right-of-way by virtue of the 1880 and 1882 agreements alone. At the time of those agreements, § 2116, Rev.Stat. (now 25 U.S.C. § 177) (hereinafter referred to as "section 177"), provided in part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

The 1880 and 1882 agreements purport to convey a claim to Indian lands from an Indian tribe and are therefore invalid under section 177.

But section 177 is not applicable to the sovereign United States and Congress clearly has authority to deal with Indian lands. *See Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 119–24, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). Southern Pacific thus argues that it acquired a right-of-way pursuant to certain acts of Congress. First, it claims that since the Walker River Reservation was created by executive order, it acquired a right-of-way under the 1875 Act by filing maps in 1881. Even though the 1875 Act is expressly not applicable to "any . . . Indian reservation," § 5, 18 Stat. 483 (43 U.S.C. § 938), Southern Pacific argues either that the Act does apply to executive order reservations or that the reservation was terminated to the extent of the right-of-way by the approval of maps. Second, Southern Pacific argues that it obtained a right-of-way for the railroad as constructed through the reservation under the Act of March 2, 1899, ch. 374, 30 Stat. 990 (codified at 25 U.S.C. §§ 312–18) (hereinafter referred to as the "1899 Act") upon the Act's passage in 1899. Finally, Southern Pacific argues that it obtained a right-of-way under the 1875 Act through the lands ceded by the Indians to the United States and opened by the President to disposal under the public land laws either in 1926 when amended maps of location were approved or in 1906 when the lands were opened to settlement.

of members of a Rule 23(b)(2) class could not be aggregated. 410 F.2d at 976, 978.

**12.**  The Tribe and allottees moved to amend their complaint in the trial court to assert jurisdiction of the allottees' claims under 25 U.S.C. § 345. The district court apparently never ruled on this motion; the decision on summary judgment noted that in light of the court's conclusion that jurisdiction existed under 28 U.S.C. § 1331, the issue of jurisdiction under 25 U.S.C. § 345 need not be reached. We decline to consider at this time whether jurisdiction might be proper under 25 U.S.C. § 345. On remand, the Indians will have an opportunity to amend their complaint, 28 U.S.C. § 1653, and the district court should have the first opportunity to consider the issue.

We note that even if the district court does not have jurisdiction over the class action by the allottees, the United States has raised similar trespass claims with respect to allotted lands, although it is seeking somewhat different relief. The court has jurisdiction to determine the claims raised by the United States and the United States has the capacity to sue for the protection of allotted lands. *Heckman v. United States,* 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912).

We reject the first two of these contentions and affirm the district court's holding that Southern Pacific does not have a complete easement. We reverse the district court in part, however, and hold that Southern Pacific has a valid easement through the lands ceded in 1906.

After determining the threshold issue of easement, we must next decide whether Southern Pacific had a license. The Tribe and the United States argue that section 177 forbids inferring a license from the 1880 and 1882 agreements and attendant circumstances. We accept this contention and reverse the district court's holding that a license should be inferred.

## IV. Right-of-way Under the 1875 Act

The 1875 Act is a general statute granting a right-of-way "through the public lands of the United States" to any railroad company which files its articles of incorporation and proofs of its organization with the Secretary of the Interior. Ch. 152, § 1, 18 Stat. 482 (43 U.S.C. § 934). There is also a provision for the filing of maps of its route. *Id.* § 4, 18 Stat. 483 (43 U.S.C. § 937). Southern Pacific claims to have complied with these requirements. Indeed, the Tribe and the United States admit that the Secretary of the Interior approved the requisite certificates and a map of the railroad in 1881.

The Tribe and the United States argue that Southern Pacific did not acquire a right-of-way by virtue of this approval, however, since the 1875 Act expressly does not apply "to any lands within the limits of any . . . Indian reservation, . . . unless such right of way shall be provided for by treaty-stipulation or by act of Congress heretofore passed."[13] *Id.* § 5 (43 U.S.C. § 938). All parties agree that no such treaty-stipulation or act of Congress exists.

Southern Pacific has two closely related responses. First, it argues that "Indian reservation" as used in the statute refers only to reservations established by treaty or statute and not to reservations established by executive order; therefore, the 1875 Act does apply to the Walker River Reservation. Second, Southern Pacific argues that even if the 1875 Act does not apply to executive order reservations, the approval of maps by the Secretary of the Interior had the effect of terminating the reservation by the Executive to the extent of the right-of-way shown on the maps so that the 1875 Act then can apply to grant the railroad a right-of-way through the terminated part of the reservation. Both of these arguments are based on the special legal status of Indian reservations created by executive order. Before examining the arguments, the status of this type of reservation should be clarified.

### A. Special Status of Executive Order Reservations

The historic foundations of Indian law are instructive. In the era of colonial imperialism, the European powers agreed "that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession." *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 573, 5 L.Ed. 681 (1823). While the natives retained the right to occupy their aboriginal lands, title and dominion were in the discoverer who had the exclusive right to extinguish the Indian title by purchase or by conquest. The United States has recognized these principles and has always asserted the rights originally acquired by the European powers by discovery. *Id.* at 572–74, 587–89, 5 L.Ed. 681.

The early practice of the United States was to deal with the Indians by treaty. Great tracts of Indian lands were purchased and the Indian tribes were gradually moved westward. Even though Indian rights to possess tribal lands might be

---

**13.** When codified, the term "passed prior to March 3, 1875" was substituted for "heretofore passed."

**686**

guaranteed by treaty, Congress retains plenary authority to control the use of such lands, to grant adverse interests and to extinguish Indian title completely. *See* Cohen, Federal Indian Law, *supra,* at 94–96. Abrogation of Indian treaty rights is not lightly inferred from congressional acts, however. *See generally* Wilkinson & Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth"—How Long a Time Is That?,* 63 Calif.L.Rev. 601 (1975). Abrogation of treaty rights is also subject to constitutional limitation—such property rights cannot be taken without payment of just compensation. *United States v. Creek Nation,* 295 U.S. 103, 110, 55 S.Ct. 681, 79 L.Ed. 1331 (1935).

In 1871 Congress banned any further use of the treaty power in dealing with the Indians. Act of March 3, 1871, ch. 120, § 1, 16 Stat. 566 (codified at 25 U.S.C. § 71).[14] After the period of treaty-making, much of the responsibility for reserving parts of the public domain for Indian use shifted from Congress to the Executive. Although Indian reservations had been created by executive order as early as 1855, *see* Cohen, Federal Indian Law, *supra,* at 299, the authority of the President and the nature of the Indians' rights with respect to such reservations were matters of doubt in the 1870's and 1880's.

Most of these doubts have now been resolved. The Supreme Court has held that Congress delegated to the President the power to reserve public lands from disposition under the public land laws for Indians or for other purposes by long-continued acquiescence in the exercise of that power. *United States v. Midwest Oil Co.,* 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915); *see Grisar v. McDowell,* 73 U.S. (6 Wall.) 363,

381, 18 L.Ed. 863 (1868). The courts have held that as long as an executive order creating a reservation remains in effect, the Indian title to the reservation lands deserves the same protection as the Indian title to reservations created by treaty or statute. *Spalding v. Chandler,* 160 U.S. 394, 404, 16 S.Ct. 360, 40 L.Ed. 469 (1896); *Gibson v. Anderson,* 131 F. 39, 41–42 (9th Cir. 1904); *McFadden v. Mountain View Mining & Milling Co.,* 97 F. 670, 673 (9th Cir. 1899), *rev'd on other grounds,* 180 U.S. 533, 21 S.Ct. 488, 45 L.Ed. 656 (1901). Congress also, at least in practice, has not discriminated against executive order reservations. *See* Note, *Tribal Property Interests in Executive-Order Reservations: A Compensable Indian Right,* 69 Yale L.J. 627, 638 (1960).

One distinguishing feature of Indian rights in executive order reservations has appeared, however. Before Congress prohibited future changes in Indian reservations by executive order,[15] it was common practice for the President to terminate or reduce in size executive order reservations without payment of compensation. *See* 34 Op.Atty.Gen. 181, 186–89 (1924). The legality of this practice was finally settled when the Supreme Court held that although Congress had delegated to the President the power to create reservations, it had never delegated the power to confer compensable property interests in the Indians. *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 325–26, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). There the Court found no congressional recognition of the existence of compensable tribal property interests in a reservation created by executive order in 1875 and terminated in 1884. It therefore held that no right to compensation existed upon the termination of such a reservation. *Id.* at 331, 62 S.Ct. 1095.

---

**14.** This statute resulted from dissatisfaction of the House of Representatives with the practical denial to it of any role in making Indian policy by the exclusiveness of Senate power under the Constitution (art. II, § 2, cl. 2) to ratify treaties. *See Antoine v. Washington,* 420 U.S. 194, 202, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); S. Tyler, A History of Indian Policy 79 (1973).

**15.** The creation of new executive order reservations was prohibited by the Act of June 30, 1919, ch. 4, § 27, 41 Stat. 34 (codified at 43 U.S.C. § 150) and changes in the boundaries of existing reservations by executive order were prohibited by the Act of March 3, 1927, ch. 299, § 4, 44 Stat. 1347 (codified at 25 U.S.C. § 398d).

Although it has been argued that in 1927 Congress recognized compensable tribal property interests in executive order reservations, see Note, *Tribal Property Interests, supra,* 69 Yale L.J. at 637, none of the parties contends that Congress had recognized any such rights of the Walker River Tribe to its reservation as of 1881 when the railroad was constructed.

■ Thus, the status of executive order reservations can be summarized as follows: the Indians have the exclusive right to possession but title to the lands remains with the United States. Congress has plenary authority to control use, grant adverse interests or extinguish the Indian title. In these respects, executive order reservations do not differ from treaty or statutory reservations. The one difference is that so long as Congress has not recognized compensable interests in the Indians, executive order reservations may be terminated by Congress or the Executive without payment of compensation. In light of this background, we now turn to the specific arguments advanced by Southern Pacific.

B. Does the 1875 Act Apply to Executive Order Reservations?

■ The first issue raised by Southern Pacific is a matter of statutory construction which is easily resolved in favor of the Indians. Southern Pacific asserts at the outset that the 1875 Act should be liberally construed to effectuate its purposes. *Great Northern Ry. v. United States,* 315 U.S. 262, 272, 62 S.Ct. 529, 86 L.Ed. 836 (1942); *Great Northern Ry. v. Steinke,* 261 U.S. 119, 124, 43 S.Ct. 316, 67 L.Ed. 564 (1923). Since, however, the specific provision in question is an exclusion of Indian reservations from the "public lands" available under the statute for railroad rights-of-way, a different rule of construction comes into play: statutes enacted for the protection of Indians must be broadly construed in the Indians' favor. *See Antoine v. Washington,* 420 U.S. 194, 199–200,

95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). After examining the language of the 1875 Act, its legislative history and the interpretations placed upon it by Congress and the Department of the Interior in the light of this rule of construction, we conclude that Congress intended to exclude executive order reservations from application of the Act.

The 1875 Act, by its own terms, does "not apply to any lands within the limits of any . . . Indian reservation, . . . unless such right of way shall be provided for by treaty-stipulation or by act of Congress heretofore passed." [16] Ch. 152, § 5, 18 Stat. 483 (43 U.S.C. § 938). The exclusion from the Act of *any* Indian reservation obviously must include executive order reservations. Southern Pacific points to the "treaty-stipulation or by act of Congress heretofore passed" language as limiting "any . . . Indian reservation" to treaty or statutory reservations. But Southern Pacific has taken the phrase completely out of context. The phrase appears in the clause "unless such right of way shall be provided for by treaty-stipulation or by Act of Congress . . . ." Manifestly, it is the "right of way" and not the "Indian reservation" which must be provided for by treaty or prior act of Congress.

Southern Pacific next claims that the reference to treaty-stipulation or prior act of Congress at least creates an ambiguity since "by definition, as to executive order reservations, Congress would not have 'heretofore passed' legislation." This suggestion is without merit. While it is true that Congress by definition would not have "heretofore passed" legislation establishing executive order reservations, it does not follow that Congress by definition would not have "heretofore passed" legislation granting rights-of-way across such reservations. While we cannot cite examples of such legislation passed before 1875,[17] there

**16.** See note 13 *supra.*

**17.** Most of the large western executive order reservations were not created until after 1871. *See* 1 Kappler, *supra* note 6, at 801–936.

are numerous examples of such legislation enacted after 1875.[18] Thus the language of the statute is in no way inconsistent with a congressional intent to exclude all Indian reservations, including executive order reservations, from application of the 1875 Act.

Even if we were to conclude that the 1875 Act is ambiguous on this point, however, our examination of the legislative history of the Act and the subsequent interpretations of it by Congress and the Department of the Interior leads us to construe it as not applying to executive order reservations. The issue was extensively debated on the floor of the Senate. The original Senate bill did not expressly except Indian reservations from its application. When such an amendment was offered, several Senators objected, contending that because of the great extent of executive order reservations in the territories and the "fugitive and floating" nature of Indian property rights in such reservations, a blanket prohibition of right-of-way grants through these reservations would unnecessarily impede railroad development in the unsettled West. Thus Senator Sargent offered an alternative amendment which would have allowed the Secretary of the Interior to approve right-of-way grants through executive order reservations. 2 Cong.Rec. 2988–89 (1874).

The views represented by this proposal, however, failed to carry the day. The opposition's response was that even though the federal government may have the power to terminate an executive order reservation or sanction an invasion of such a reservation by a railroad, it would not be wise to do so as a matter of policy. *Id.* at 2990 (remarks of Senator Hamilton).

Thus it appears that the problem of executive order reservations was explicitly brought to the attention of Congress in the debates leading to the 1875 Act. The Act was nevertheless phrased so as not to apply to "any . . . Indian reservation." It is therefore not open to Southern Pacific to argue that the purpose of the Act would be better effectuated if it did apply to executive order reservations—that issue was resolved against Southern Pacific and in favor of the Tribe by Congress in 1875.

This construction of the Act is consistent with the interpretation placed upon it by the Secretary of the Interior. Contrary to Southern Pacific's argument that the Department of the Interior has always considered the Secretary's approval of maps in 1881 as conferring a valid right-of-way under the 1875 Act, the Secretary at the time considered the approval of maps a mistake. As soon as the fact that the railroad crossed the Walker River Reservation was brought to the Secretary's attention, he directed that an agreement between the Indians and railroad be drawn up and submitted to Congress for ratification.[19] To this day the Bureau of Indian Affairs has no record of any grant of a right-of-way under a treaty or convention pursuant to 25 U.S.C. § 177, or under any other congressional act, general or special.

The construction of the 1875 Act adopted here is also consistent with the interpretation of the Act apparently accorded to it by Congress. Thus in the years after passage of the 1875 Act, but before passage of the 1899 Act generally granting railroad rights-of-way across Indian reservations, Congress passed a number of special statutes granting rights-of-way to specific railroads across specific executive order reservations.[20]

18. See note 20 *infra.*

19. *See* S.Exec.Doc.No.17, 49th Cong., 1st Sess. 4–5 (1885). The Commissioner of Indian Affairs wrote to the Secretary of the Interior on December 4, 1882:

Section 5 of the [1875 Act] expressly excepting Indian reservations . . . "unless such right of way shall be provided for by treaty stipulations or by act of Congress heretofore passed," and, no such provision being extant in the case of the Walker River

Reservation (which . . . was created by executive order), it appeared to this office that the authority to grant a right of way through the reservation rested in Congress alone . . . .

*Id.* at 4. The Secretary agreed and instructed the Indian office to obtain an agreement for submission to Congress. *Id.*

20. *E. g.,* Act of August 5, 1882, ch. 394, 22 Stat. 299 (right-of-way across the Papago Reserva-

That Congress did not consider the 1875 Act applicable to executive order reservations is made even more clear by a clause in at least one of these statutes to the effect that "all the provisions of [the 1875 Act] are hereby declared to be applicable [to the right-of-way granted by this special statute] to the same extent as though the lands in said reservation were open to settlement and sale." Act of March 6, 1896, ch. 42, 29 Stat. 45 (granting right-of-way across the Colville Reservation, established by executive order of President Grant, July 2, 1872, 1 Kappler, *supra* note 6, at 916). If Congress considered the 1875 Act applicable to executive order reservations, this clause would be superfluous.

■■■ We hold that the General Railroad Right of Way Act of 1875 does not apply to executive order reservations and that the attempted compliance with that Act in 1881 by the Carson & Colorado and the Interior Department was therefore not effective to perfect a right-of-way through the Walker River Reservation.

## C. Was the Reservation Terminated by Approval of Maps?

Southern Pacific's second argument is more subtle. It claims that even if the 1875 Act does not apply to executive order reservations, it still obtained a right-of-way under the Act when the maps of definite location were approved by the Secretary of the Interior in 1881. It asserts that the Secretary had the authority to return lands reserved by executive order to the public domain for disposition under the public land laws and that the effect of the Secretary's approval of maps in 1881 was to terminate the reservation to the extent of the right-of-way sought. Once the reservation was terminated in this manner, the 1875 Act could simultaneously apply to grant the railroad the right-of-way sought.

■■■ We reject this argument. We note that while the executive branch has broad authority to withdraw public lands from disposition under the public land laws for the benefit of Indians and to manage the disposition of Indian lands, *see United States v. Consolidated Mines & Smelting Co.,* 455 F.2d 432, 442–44 (9th Cir. 1971); *United States v. Barnsdall Oil Co.,* 127 F.2d 1019 (10th Cir. 1942), the source of this authority is congressional acquiescence in its exercise. *See United States v. Midwest Oil Co., supra,* 236 U.S. at 472–75, 35 S.Ct. 309; *Sioux Tribe of Indians v. United States, supra,* 316 U.S. at 326, 62 S.Ct. 1095. Since the authority is delegated by Congress, its exercise can be regulated by Congress. In 1875 Congress granted rights-of-way to railroads through public lands but specifically provided that the grants not be made through Indian reservations. This provision implicitly denied the Secretary whatever authority he might previously have had to terminate an executive order reservation to the extent of a requested railroad right-of-way merely by approval of maps of definite location. Were we to hold otherwise, we would completely subvert the determination of Congress that railroad rights-of-way should not be granted

tion established by executive order of President Grant, July 1, 1874, 1 Kappler, *supra* note 6, at 805); Act of February 15, 1887, ch. 130, 24 Stat. 402 (right-of-way across the Fort Berthold Reservation established by executive order of President Hayes, July 13, 1880, 1 Kappler, *supra,* at 883); Act of May 30, 1888, ch. 336, 25 Stat. 160 (right-of-way across the Coeur d'Alene Reservation established by executive order of President Grant, November 8, 1873, 1 Kappler, *supra,* at 837); Act of May 8, 1890, ch. 198, 26 Stat. 102 (right-of-way across the Colville Reservation established by executive order of President Grant, July 2, 1872, 1 Kappler, *supra,* at 916); Act of February 18, 1895, ch. 95, 28 Stat. 665 (right-of-way across the San

Carlos division of the White Mountain Reservation, established by executive order of President Grant, December 14, 1872, 1 Kappler, *supra,* at 812–13); Act of March 6, 1896, ch. 42, 29 Stat. 44 (right-of-way across the Colville Reservation); Act of June 4, 1898, ch. 377, 30 Stat. 430 (same); Act of June 18, 1898, ch. 465, 30 Stat. 475 (same).

These special statutes typically granted rights-of-way narrower than the 100 feet on each side of the road granted by the 1875 Act (43 U.S.C. § 934). The statutes also typically made some provision for obtaining the Indians' consent to construction of the railroad and for the payment of compensation.

through executive order reservations under the 1875 Act.

We recognize that even after 1875, the President or the Secretary of the Interior could still alter the boundaries of, or even extinguish completely, an executive order reservation in order to make way for a railroad. But that clearly is not what was done here. First, the Secretary's approval of maps does not purport to terminate the reservation. The affidavit submitted with the maps by the president of the Carson & Colorado recites "that the maps have been prepared to be filed for the approval of the Secretary of the Interior, in order that the company may obtain the benefits of the [1875 Act]." The Secretary's approval is then noted on the same page: "Dept. of the Interior, 29th January 1881. Approved. C. Schurz. Secretary." The maps clearly indicate the Walker River Reservation boundaries with no mention of their being altered.

Secondly, the Secretary obviously did not intend his approval of the maps to terminate the reservation to the extent of the right-of-way. As pointed out earlier, he considered his approval of the maps a mistake and instructed the railroad to procure an agreement with the Indians to be ratified by Congress.

Finally, even if the Secretary intended to terminate the reservation, he could not do so by such informal means as approval of maps submitted under the 1875 Act. We have held that revocation of withdrawals from public land for reservation use may not be accomplished "by circumstances or procedures less formal than those attending [the withdrawal, or else] confusion would be encouraged in the field of property law, a field in which certainty has undisputed advantages." *United States v. Consolidated Mines & Smelting Co., supra*, 455 F.2d at 466. The Walker River Reservation was created when the Indian Commissioner asked the Commissioner of the General Land Office to respect the reservation in future public surveys and to direct the local land offices to respect the reservation on their books in the meantime. *See United States v. Walker River Irrigation District*,

104 F.2d 334, 338 (9th Cir. 1939). These actions were later ratified by executive order of President Grant, March 19, 1874. 1 Kappler, *supra* note 6, at 869.

In contrast, the approval of maps in 1881 which allegedly terminated part of the reservation was not accompanied by these formalities. Never was there a direction to the General Land Office that the reservation boundaries had been changed; nor was there an executive order ratifying the act. We conclude that no right-of-way was acquired through the Walker River Reservation under the 1875 Act by erroneous approval of maps by the Secretary.

**V. Right-of-Way Under the 1899 Act**

In 1899 Congress enacted a general statute granting rights-of-way through Indian reservations to "any railroad company organized under the laws of the United States, or of any State or Territory, which shall comply with the provisions of this Act and such rules and regulations as may be prescribed thereunder . . . ." Act of March 2, 1899, ch. 374, § 1, 30 Stat. 990 (codified at 25 U.S.C. § 312). Southern Pacific contends that it acquired a right-of-way under the 1899 Act upon its becoming effective either by: (1) construction of the railroad in 1882, or (2) "de facto" compliance with the requirements of the Act in 1881 and 1882.

The district court began its analysis of these contentions by noting: "Since the railroad lines here in question were built between 1880 and 1882, the question with respect to the Act of 1899 becomes whether it is to be given retroactive application." The court then concluded that the 1899 Act did not contain the clear expression of intent required to construe a statute as retroactive. This reasoning, however, does not meet Southern Pacific's argument. It is not contending that the 1899 Act applied retroactively to grant a right-of-way effective from the railroad's construction in 1882. It contends only that it acquired a right-of-way under the Act upon its becoming effective in 1899. This argument leaves open the claims of the Tribe and the United

States that the railroad was a trespasser from 1882 to 1899, but it does not call for retroactive application of the 1899 Act. But even though we do not accept the district court's reasoning, we reach the same result and reject Southern Pacific's claims that it acquired a right-of-way under the 1899 Act.

First, we reject the contention that construction of the railroad alone is sufficient to acquire a right-of-way under the Act. Southern Pacific relies on cases decided under the 1875 Act, section 1 of which provides: "[A] right of way through the public lands . . . is hereby granted to any railroad company . . . which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization . . . to the extent of one hundred feet on each side of the central line of said road . . . ." Ch. 152, 18 Stat. 482 (43 U.S.C. § 934). The courts have held that this is a grant *in praesenti* to an unidentified grantee of an unspecified right-of-way. The grantee is identified by filing its articles and proofs of organization. The right-of-way may be specified in advance of construction by the filing and approval of maps of location pursuant to section 4 of the 1875 Act. 18 Stat. 483 (43 U.S.C. § 937); *Jamestown & N. R. R. v. Jones,* 177 U.S. 125, 131, 20 S.Ct. 568, 44 L.Ed. 698 (1900). Alternatively, the right-of-way may be specified by actual construction of the railroad without ever filing maps. *Id.* at 130–32, 20 S.Ct. 568.

Southern Pacific argues that since the language, requirements, principles and policies of the 1899 Act are similar or identical to those of the 1875 Act, the 1899 Act should be construed in the same way: a right-of-way may be acquired by filing the company's articles and proofs of organization and by actual construction of the railroad. This contention is wholly without merit. The granting clause of the 1899 Act is significantly different from that of the 1875 Act. Section 1 of the 1899 Act grants the right-of-way "to any railroad company . . . which shall comply with the pro-

visions of this Act . . . ." Ch. 374, 30 Stat. 990 (25 U.S.C. § 312). The grantee under the Act is therefore not identified merely by filing articles and proofs or organization as under the 1875 Act; the grantee must in addition comply with all the provisions of the Act including the requirements that maps be filed and approved and that compensation be paid to the Indians. *Id.* § 3, 30 Stat. 991 (25 U.S.C. § 314). Construction of the railroad is clearly not sufficient to acquire a right-of-way grant under the 1899 Act.

Southern Pacific's second contention, that the 1899 Act applies to railroads constructed before passage of the Act where there was "de facto" compliance with the requirements of the Act is more difficult. The Tribe and the United States contend that the 1899 Act should be construed as not applying to railroads already constructed whether or not there was de facto compliance with the requirements of the Act. They cite the language of the Act and the regulations promulgated thereunder as indicating that only lines to be constructed in the future are included.

We do not find much assistance in this language, however. Some of the provisions cited do not refer to construction at all but only specify conditions precedent to effectiveness of the grant. For example, section 3 of the Act provides that "before the grant . . . shall become effective a map . . . must be filed with and approved by the Secretary . . . and the company must make payment to the Secretary . . . for the benefit of the tribe . . . ." *Id.* (25 U.S.C. § 314). This provision by itself does not preclude the grant's becoming effective long after construction of the railroad.

Other provisions seem to presume that the railroad to be constructed in the future without necessarily precluding application of the Act to an existing railroad. For example, there is a proviso in section 1 of the Act "[t]hat no right of way shall be granted . . . until the Secretary . . . is satisfied that the company [has the] . . . intent and ability to con-

struct said road . . . ." *Id.,* 30 Stat. 990 (25 U.S.C. § 312). This provision obviously contemplates an application made in advance of construction, but intent and ability to construct cannot be more effectively demonstrated than by completed construction.

The language of the 1875 Act generally contemplates that the railroads would be constructed in the future but that Act nevertheless has been held to apply to railroads constructed before 1875. *Rio Grande W. Ry. v. Stringham,* 38 Utah 113, 119–20, 110 P. 868, 870–71 (1910), *aff'd,* 239 U.S. 44, 36 S.Ct. 5, 60 L.Ed. 136 (1915). That decision, however, was based on an inferred contemporaneous interpretation of the Act by the Secretary of the Interior. Here the Tribe argues that the Secretary interpreted the 1899 Act as not applying to previously constructed railroads. Thus in 1901 the Department of the Interior took the position that it was necessary for Congress to ratify an agreement between the Devils Lake Tribe and the Jamestown & Northern Railway granting a right-of-way across the reservation for a previously constructed railroad. The sponsoring congressman explained that the bill was necessary "because the general law passed since [the last treaty with the Tribe—presumably the 1899 Act] on the subject is not applicable to this particular location." 34 Cong.Rec. 3482 (1901) (remarks of Mr. Spalding).

Southern Pacific properly notes that the Devils Lake episode does not provide a clear picture of the Department of the Interior's position. The Jamestown & Northern had contracted with the Indians for a 200-foot right-of-way, *see* Act of March 3, 1901, ch. 869, 31 Stat. 1447, but the 1899 Act grants only 100 feet. If the Jamestown & Northern insisted upon 200 feet, congressional ratification would be necessary even if the company could acquire 100 feet under the 1899 Act. This possibility is as consistent with the documents cited by the Tribe as its contention that the Department of the Interior did not consider the 1899 Act applicable to any previously constructed railroad. Therefore, we do not rest our decision on a

contemporaneous administrative construction of the 1899 Act which holds that Act inapplicable to pre-existing railroads.

Without deciding whether the 1899 Act might apply to a pre-existing railroad in a proper case, we hold that Southern Pacific's predecessors did not comply with the 1899 Act here. Section 3 of the Act requires that the company pay the Indians full compensation "which compensation shall be determined . . . under the direction of the Secretary of the Interior, in such manner as he may prescribe." 30 Stat. 991 (25 U.S.C. § 314). The regulations provide: "[T]he United States Indian agent, or a special United States Indian agent, or Indian inspector, will be designated to determine such compensation and damages, subject to the approval of the Secretary of the Interior." 44 L.D. 463 (1899).

Southern Pacific contends that it complied with these requirements by paying the Tribe $750 pursuant to the 1880 and 1882 agreements. It appears from congressional documents cited by the parties that the Commissioner of Indian Affairs and the Secretary of the Interior "approved" the 1882 agreement before submitting it to Congress for ratification. S.Exec.Doc. No.17, 49th Cong., 1st Sess. 1, 2 (1885). As we read the Act and regulations, however, they do not allow for independent negotiations between the railroad and the Indians even if the compensation is later approved by the Secretary of the Interior. The 1899 Act was meant to protect fully Indian interests, *see* H.R.Rep.No.1896, 55th Cong., 3d Sess. 2 (1899), and we are thus obliged to construe the Act and the regulations strictly in the Indians' favor. *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918). The regulations require that the compensation be determined in the first instance by the United States Indian agent or other designated official, subject to the Interior Secretary's approval. We cannot permit Southern Pacific to bypass this procedure which was apparently designed to preclude approval without the recommendation of an

impartial Indian expert who has personally evaluated the situation.

We also conclude that the compensation should be determined as of the date the grant of the right-of-way is to be effective. Here Southern Pacific seeks a grant effective in 1899, but the compensation was negotiated and paid in 1880 and 1882. The value of the right-of-way may have changed significantly in the intervening 17 years. Thus we cannot conclude that the procedure for determining compensation followed here achieved even de facto compliance with the 1899 Act. We therefore reject Southern Pacific's argument that it acquired a right-of-way under the 1899 Act.

## VI. Right-of-Way Through Lands Ceded in 1906

We next consider whether Southern Pacific obtained a right-of-way under the 1875 Act through reservation lands ceded to the United States in 1906.

In an annual appropriations bill in 1902, Congress acted to enable part of the reservation to be opened to settlement. The Secretary of the Interior was directed to allot the irrigable lands on the Walker River Reservation to the resident Indians. Twenty acres were to be allotted to each family head and the remainder to other Indians, not to exceed 20 acres each. When the majority of heads of families had accepted allotments and agreed to relinquish the non-irrigable part of the reservation, each family head allottee was to receive $300 and the relinquished lands were to be opened by presidential proclamation "to settlement, to be disposed of under existing laws." Funds to pay the Indians were appropriated. Act of May 27, 1902, ch. 888, 32 Stat. 260–61. Congress later directed the Secretary of the Interior to set aside, before the lands were opened to settlement, non-irrigable grazing and timber lands for use by the Indians in common. Resolution of June 19, 1902, No. 31, 32 Stat. 744 (grazing); Act of June 21, 1906, ch. 3504, 34 Stat. 358 (timber).

On July 24, 1906, the Indians agreed, in consideration of the allotments [21] and cash payments provided by the 1902 Act, to "cede, grant and relinquish to the United States all right, title and interest" to the remaining reservation lands. By presidential proclamation of September 26, 1906, these relinquished lands were "opened to settlement, [to] be subject to disposal under the existing laws of the United States." 34 Stat. 3237–38.

Part of Southern Pacific's line crosses the relinquished lands. It argues that it acquired a valid right-of-way through these lands under the 1875 Act either when the lands were opened to settlement or when amended maps of definite location were approved in 1926.

The district judge rejected both of these contentions. He concluded first that the reservation boundaries had not been changed by the relinquishment and that, therefore, the ceded lands were still "within the limits of any . . . Indian reservation," which would prevent an easement due to section 5 of the 1875 Act, 18 Stat. 483 (43 U.S.C. § 938). But the district court also held that the United States took an unrestricted title to the ceded lands and did not take as trustee for the Indians. Therefore, the ceded lands were "public lands" within the meaning of section 1 of the 1875 Act, 18 Stat. 482 (43 U.S.C. § 934), and a railroad easement could be secured. Faced with this apparent conflict between sections 1 (right-of-way granted through "public lands") and 5 (Indian reservations excluded) of the 1875 Act, the district court held that section 5 supersedes and controls. No right-of-way could therefore be obtained through the ceded lands.

While this result may seem acceptable at first blush, it appears unreasonable upon examination of the interface between the 1875 and 1899 Acts. If the ceded lands remain "within the limits of any . . . Indian reservation" and therefore the exclusion in the 1875 Act prevents a right-of-

---

**21.** These allotments were made to the predecessors in interest of the allottees denied participation in the suit. See pp. 682–683, *supra.*

way, then presumably the 1899 Act granting rights-of-way "through Indian reservation," 30 Stat. 990 (25 U.S.C. § 312), does apply. Thus under the district court's reasoning, if a railroad is to obtain a right-of-way through such ceded lands, it must, pursuant to the 1899 Act, pay the Indians full compensation for the right-of-way and comply with a number of other requirements for the benefit and protection of the Indians. Yet under the terms of the cession agreement, the Indians have already been paid in full for the ceded lands by cash payments and individual allotments and they have relinquished "all right, title and interest" in those lands. Thus, as the district court interprets the 1875 Act, application of the 1899 Act would result in a windfall of double payment to the Indians and unnecessarily burdensome requirements for obtaining a railroad right-of-way.

The only alternatives to obtaining a right-of-way under the 1899 Act would be to seek a special act of Congress or to forego a right-of-way altogether. The first alternative is inconsistent with the purpose of the two general railroad right-of-way acts: to free Congress from the burden of applications for special right-of-way legislation. *See* H.R.Rep. No. 1896, 55th Cong., 3d Sess. 1 (1899). The second is contrary to the congressional policy of encouraging western settlement by promoting the extension of railroads. *See United States v. Denver & R. G. Ry.*, 150 U.S. 1, 8, 14 S.Ct. 11, 37 L.Ed. 975 (1893).

However, we are not compelled to reach this result. Assuming first, as the district judge did, that the reservation boundaries were not altered by the 1906 cession, the apparent conflict between sections 1 and 5 of the 1875 Act can be resolved by construing a statute which is even more specific. The 1902 statute initiating the cession negotiations provided that all non-irrigable lands in the reservation be purchased for a lump sum and opened to settlement, "to be disposed of under existing laws." 32 Stat. 261. Since the stated purpose of the statute is to open the ceded lands to settlement, we conclude that the "existing laws" which Congress made applicable to the ceded lands are those laws relating to the disposition of public lands, including, as the district judge recognized, the 1875 Act. This 1902 statute, as implemented by the cession agreement and presidential proclamation, constitutes a special statutory exception to the broad exclusion of Indian reservations from application of the 1875 Act. While in general the 1875 Act does not apply to lands "within the limits of any . . . Indian reservation," we conclude that it applies to the ceded lands within the Walker River Reservation because in 1902 Congress expressly directed that it should.

But even if the 1902 statute is ambiguous on this point, we reach the same result. We find that, contrary to the district judge's assumption, the 1906 cession altered the boundaries of the reservation so that the ceded lands were no longer "within the limits of" the reservation. The ceded lands were thus available for a right-of-way grant under section 1 and not within the exclusion of section 5 of the 1875 Act.

The 1906 cession is a special variant of a general policy embodied in the General Indian Allotment Act of 1887 (Dawes Act), ch. 119, 24 Stat. 388 (codified at 25 U.S.C. § 331 et seq.).[22] The Dawes Act granted the President discretionary power to allot reservation lands to the resident Indians in severalty. The Indians were to receive patents inalienable for 25 years and the benefits of United States citizenship. The idea was to "civilize" the Indian by forcing him to abandon tribal life and take up the ways of the white farmers. An ancillary benefit for western land interests was that the "surplus" reservation lands remaining after allotments were to be purchased from the Indians and opened to settlement.[23]

---

**22.** The policy of allotment and sale of surplus reservation lands was repudiated in 1934 by the Indian Reorganization Act, ch. 576, 48 Stat. 984 (amended and codified at 25 U.S.C. §§ 461 et seq.).

**23.** For an extended treatment of allotment policy, see generally Otis, The Dawes Act and the Allotment of Indian Lands, *supra* note 10.

In view of the discretionary nature of the presidential power under the Dawes Act to open reservations for allotment, Congress has from time to time enacted special legislation to assure that a particular reservation was subject to allotment. *Mattz v. Arnett,* 412 U.S. 481, 496–97, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). The statutes opening the Walker River Reservation to settlement are examples of such special legislation.

Although the ultimate aim of the general policy of allotment was the abolition of Indian reservations, a reservation was not necessarily terminated or diminished by the first step of allotment and sale of surplus lands. The effect of opening a reservation to settlement on the reservation boundaries has most frequently been discussed in the context of exclusive federal jurisdiction over prosecutions for certain crimes committed within "Indian country," defined to include "all land within the limits of any Indian reservation." 18 U.S.C. § 1151(a). Most of the cases have held that reservation boundaries are not changed by allotment and sale of surplus lands. *E. g., Mattz v. Arnett, supra,* 412 U.S. at 498–506, 93 S.Ct. 2245; *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); *United States ex rel. Condon v. Erickson,* 478 F.2d 684 (8th Cir. 1973). But the cases have not announced a fixed rule. Rather, they have concluded that a congressional determination to terminate (and inferentially to diminish) an Indian reservation must be express or be clear from the sur-

rounding circumstances and legislative history. *Mattz v. Arnett, supra,* 412 U.S. at 505, 93 S.Ct. 2245.

Based upon these cases, it may have appeared to the district judge at the time he decided this case that a special allotment statute would be construed strictly so as to rebut a claim that a reservation had been terminated or diminished by the statute. But subsequent to this decision, the Supreme Court distinguished *Mattz* and *Seymour* and found an implied intent to diminish a reservation in a special allotment statute. *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

After examining all the circumstances of this case, we conclude that the 1906 cession did alter the Walker River Reservation boundaries by removing the relinquished lands from "within the limits of" the reservation. The most significant circumstances leading us to this conclusion are the language and terms of the cession agreement itself and the subsequent treatment of these lands by Congress and the Interior Department.

■■■ The cession language of the agreement here is virtually identical to the language construed in *DeCoteau.* The Tribe agreed to "cede, grant and relinquish . . . all right, title and interest." As the Court noted in *DeCoteau,* this language is "precisely suited" to the purpose of terminating the reservation status of the ceded lands. *Id.* at 445, 95 S.Ct. 1082.[24] Also

---

**24.** *Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920), cited by the district court, is not to the contrary. There the Crow Indians of Montana had ceded part of their reservation lands to the United States using language virtually identical to that used by the Tribe here. Sheepowners then pastured some 5,000 sheep on the ceded lands without the Indians' consent and the United States sued for the statutory penalty provided by Rev.Stat. § 2117 (now 25 U.S.C. § 179). The issue was not *whether the lands were within the limits of* a reservation, but whether the lands "belong[ed] to any Indian or Indian tribe." The government had not paid the Indians a fixed sum for the lands but instead promised to use the proceeds of any sales to settlers for the Indians' benefit. The Court held that as long as the United States retained title, it held it in

trust for the Indians. The lands thus "belong[ed] to" the Indians within the meaning of the statute regardless of the reservation status of the lands.

Neither is *Clarke v. Boysen,* 39 F.2d 800, 812–15 (10th Cir. 1930), also cited by the district court, to the contrary. The facts of that case were similar to those in *Ash Sheep*: the Shoshone and Arapahoe tribes ceded part of their reservation to the United States; proceeds from the sales of these lands were to be applied *to the Indians' benefit. Act of March 3, 1905, ch. 1452, 33 Stat. 1016.* Before the ceded lands were sold, a railroad attempted to obtain a right-of-way under the 1899 Act. Later purchasers contended that the right-of-way was invalid because the 1899 Act did not apply to the ceded lands. The court rejected this contention, not because the lands were still part of

as *DeCoteau*, the agreement here vests in the Tribe a sum certain ($300 per family head allottee) for the ceded lands, instead of merely providing that the uncertain future proceeds of sales of the opened lands be applied for the Indians' benefit.[25]

Finally, the legislative history of a later statute adding land, including significant amounts of *land ceded in 1906*, to the Walker River Reservation indicates that Congress and the Interior Department treated the earlier cession as having diminished the reservation. A letter from the Secretary of the Interior proposing an addition to the diminished reservation stated: "The proposed addition embraces vacant public-domain lands adjacent to the present Walker River Reservation." S.Rep.No.1750, 74th Cong., 2d Sess. (1936). The statute authorized the Secretary of the Interior "to set aside . . . acres . . . of the public-domain . . . as an addition" to the reservation. Act of June 22, 1936, ch. 698, § 1, 49 Stat. 1806–07. The order implementing the statute recited that "the lands . . . are set aside and made a part of the existing Walker River Reservation . . . ." Specifically, a later order restored a portion of the *relinquished* lands to the reservation in similar language: "[T]he following described lands . . . are hereby *added to* and made a part of the Walker River Reservation . . . ." (Emphasis added.) Finally, a map of the

reservation dated 1943 on file with the Branch of Real Property Management, Nevada Indian Agency, indicates the original 1874 executive order boundaries with the legend: "Approximate Location of Old Boundary Line."

Thus we conclude that the 1906 cession had the effect of changing the boundaries of the Walker River Reservation. The ceded lands were restored to the public domain and were no longer "within the limits of" the reservation. These lands were therefore available for right-of-way grants under the 1875 Act.

The only remaining issue is whether the right-of-way through the ceded lands was obtained under the 1875 Act in 1926 when amended maps were approved by the Secretary of the Interior or in 1906 when the cession became effective. This makes no difference, however, with respect to the Tribe's claim for damages. The Tribe had no interest in the ceded lands between 1906 and 1926 and therefore would have no cause of action for trespass over these lands for that period even if the right-of-way were not obtained until 1926. When some of the ceded lands were restored to the reservation in 1936, the right-of-way was not affected. The 1936 statute and order restored the lands subject to any valid existing rights. § 1, 49 Stat. 1807.

■ The issue does assume importance with respect to the claim of the United

an Indian reservation, but because the lands were reserved "for other purposes in connection with the Indian service," to which the 1899 Act also applies. § 1, 30 Stat. 990 (25 U.S.C. § 312). This result is just on the facts of that case: where the United States holds the lands in trust for the Indians, the Indians should receive the benefit of compensation for a right-of-way granted just as they receive compensation for lands taken by settlers. But here, the Indians have been paid in full for the ceded lands and the lands are neither held in trust for the Indians nor reserved "for other purposes in connection with the Indian service." Therefore, the 1899 Act should not apply. In this situation the lands are "public lands" available for right-of-way grants under the 1875 Act.

25. *DeCoteau* involved one additional circumstance which may not be involved here. The cession agreement was the result of negotia-

tions with the Indians, unlike the cessions that were unilaterally declared by Congress in *Mattz* and *Seymour*. Our case falls somewhere between their two poles. We have not been able to find any legislative history indicating whether the 1902 statute was the result of negotiations with the Indians. The statute appears to declare unilaterally that allotments and $300 cash payments be made, but it also *provides that the remaining lands be opened to* settlement only after the Indians' consent is obtained. On this issue, this case is thus distinguishable from both *DeCoteau* on the one hand and *Mattz* and *Seymour* on the other. However, in the light of the language and terms of the agreement and the subsequent treatment of the ceded lands, the extent to which the cession may have been unilaterally imposed by Congress does not alter our conclusion that the reservation was diminished.

States since it did have an interest in the ceded lands during the relevant period. Its claim is not barred by any statute of limitations or by the negligence of its officials in asserting its rights. 28 U.S.C. § 2415; *United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). The issue is easily resolved, however. A right-of-way may be obtained under the 1875 Act by construction of the railroad without any filing of maps. *Jamestown & N. R. R. v. Jones, supra*, 177 U.S. at 130–32, 20 S.Ct. 568. Since the railroad here was already constructed when the 1906 cession became effective, a right-of-way was obtained under the 1875 Act at that time.

Therefore, we conclude that the correctness of the district court's conclusion that there was a revocable license is irrelevant as to the ceded lands for the period from 1906 to 1972 because as to that part of the railroad line for that period, Southern Pacific enjoys a right-of-way. The issue must be decided, however, as to the remaining Indian lands and the ceded lands prior to 1906.

VII. Revocable License from 1882 to 1972

The district court held that although Southern Pacific does not have a valid easement for a railroad right-of-way through the reservation, it did have an implied license which was not revoked until the Tribe filed its complaint in this action. The effect of this holding is to immunize Southern Pacific from the trespass claims of the Tribe and the United States[26] from 1882 when the railroad was constructed to the time the license was revoked in 1972.

The district court recognized that the 1880 and 1882 agreements were not effective to convey the grantee an easement through the reservation because an ease-

ment is an interest in land which can be conveyed by an Indian tribe only "by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. The district court reasoned, however, that creation of a license is not a conveyance prohibited by section 177. A license was viewed as merely "authority to do a particular act, or series of acts, on another's land, without possessing any estate therein." *Smith v. Royal Insurance Co.*, 111 F.2d 667, 670 (9th Cir.), *cert. denied*, 311 U.S. 676, 61 S.Ct. 43, 85 L.Ed. 435 (1940) (citation omitted). The court then held that the construction of the railroad across the reservation, the failure of the Indians to object to its presence prior to the commencement of this suit, the acceptance by the Indians of money and other consideration pursuant to the agreements and the agreements themselves "clearly establish an implied license in favor of defendants and their predecessors in interest for the use of those lands."

■ We disagree with the district court and hold that a license may not be inferred from the 1880 and 1882 agreements and attendant circumstances. A license may not be inferred as an implied-in-fact contract because of the failure of Southern Pacific to comply with 25 U.S.C. §§ 81 & 84, which govern contracts with Indian tribes. Thus Southern Pacific argues that it had a consensual,[27] but non-contractual, relationship with the Tribe. It argues that a license may be implied-in-law as a residual privilege resulting from a failure to comply with the formal requirements for creating an easement. *See* Restatement of Property § 514 (1944). But to infer a constructive license would run counter to the historic policies underlying section 177.

Section 177 is the direct descendant of a very early statute which has been a founda-

---

**26.** We presume that the reasoning adopted by the district court would bar at least the trespass claim asserted by the United States as trustee for the Indians. To what extent the license also bars the claim of the United States on its own behalf for trespass to lands in which the Indians had no interest (*i. e.*, the lands ceded to the United States in 1906) is not addressed by the district court's opinion. We

need not reach this latter issue here, however, since we have held that Southern Pacific has a valid easement through the lands ceded to the United States in 1906.

**27.** We need not decide whether a consensual relationship existed between Southern Pacific and the Tribe in light of our interpretation of section 177.

tion of federal Indian policy. Henry Knox, the first Secretary of War under the Constitution and the manager of Indian affairs, perceived that a primary cause of Indian wars was disputes related to Indian boundaries. To prevent the steady diminution of Indian territory by individuals acquiring lands privately from the Indians, Congress declared that all dispositions of Indian lands would be invalid unless they were made by public treaty. Act of July 22, 1790, ch. 33, § 4, 1 Stat. 138. *See* S. Tyler, A History of Indian Policy 39–40 (1973). This temporary statute was amplified and then reenacted from time to time, *see* Cohen, Federal Indian Law, *supra*, at 322–23 & n. 392, until the permanent version was enacted in 1834. Act of June 30, 1834, ch. 161, § 12, 4 Stat. 730 (subsequently codified at Rev.Stat. § 2116, now 25 U.S.C. § 177).

The purpose of section 177 is "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties . . . ." *Federal Power Commission v. Tuscarora Indian Nation, supra*, 362 U.S. at 119, 80 S.Ct. at 555. To give effect to an invalid attempt to convey an interest in tribal lands in violation of the statute by holding that it creates a license would undermine this purpose. Purchasers would be encouraged to induce improvident and unfair sales of Indian lands if they could enter into possession and reap profits with immunity from trespass damages so long as no one objects.

Although there are no precedents on the precise issue before us, there are two analogous Supreme Court holdings which we deem controlling. In *Bunch v. Cole*, 263 U.S. 250, 44 S.Ct. 101, 68 L.Ed. 290 (1923), an allottee had leased his land for a term beginning at a too distant time in the future to be permissible under the applicable statute. After the leases expired, the allottee brought suit in an Oklahoma state court against the lessees for wrongful occupancy and use of the land on the theory that the leases were void. The Oklahoma Supreme Court agreed that the leases were void but construed a state statute as requiring cre-

ation of tenancy at will at the rental rate specified in the leases.

The Supreme Court reversed, holding that the state statute "gives force and effect to leases which a valid enactment of Congress declares shall be of no force or effect, and that in this respect it must be held invalid . . . ." *Id.* at 254, 44 S.Ct. at 102. The effect of this decision was to give the allottee damages for his tenants' trespass and to deny the tenants the common law defense of consent.

The reasoning of *Bunch v. Cole* is applicable to our case. Federal law provides that the 1880 and 1882 agreements have "[no] validity in law or equity." 25 U.S.C. § 177. The circumstances relied on by the district court in inferring a license are all direct results of these void agreements. The railroad was constructed across the reservation and money and other consideration paid to the Indians pursuant to these agreements. The Indians never objected because of an erroneous belief that the agreements were valid. Giving effect to the conveyances by holding that they give rise to an implied license "gives force and effect to [agreements] which a valid enactment of Congress declares shall be of no force or effect." Therefore, a license may not be inferred from this attempt to convey an easement invalid under section 177.

*Smith v. McCullough*, 270 U.S. 456, 46 S.Ct. 338, 70 L.Ed. 682 (1926), supports this analysis. A Quapaw Indian allottee leased part of his allotment for mining for 10 years (the maximum term allowed by the applicable statute) with provisos that the term be extended under specified conditions. An assignee of this lease sought a decree in equity declaring that the lease was valid and cancelling a competing lease. The lower court held that the invalid provisions for extending the term were severable and that the lease could be given effect as one for 10 years. Without disputing that the invalid terms might be severable as a matter of common law contract interpretation, the Supreme Court reversed, holding that the severability doctrine could not be applied to give effect to part of an invalid

Indian lease. The Court said that application of the doctrine would undermine the protective purpose of the statute by encouraging lessees to seek long-term leases if the only risk of adverse action was that the term would be limited to 10 years. *Id.* at 463–65, 46 S.Ct. 338.

The same analysis applies with ever greater force to an attempt to convey an easement invalid under section 177. Under the district court's theory the beneficiary of the invalid conveyance is completely immune from a trespass action, not just for a fixed term as under the theory condemned in *Smith v. McCullough,* but for as long as the invalidity of the conveyance goes unasserted—here for 90 years. We conclude that an implied license is inconsistent with the protective purpose of section 177 and that the district court erred in finding a license in these circumstances.

We do not hold that Indians may never give a license to use their lands. Although we do not decide the issue, there seems to be little doubt that Indians may permit non-Indians to come onto their reservation for some limited purpose such as hunting, fishing or sightseeing and that the Indians' consent is a good defense to a later trespass action. But such permission is clearly not what is involved in this case. No one argues that the parties to the 1880 and 1882 agreement intended that the railroad receive a mere express license, revocable at the will of the Tribe. The 1880 agreement was to grant a right-of-way "forever." This was intended, as the dis-

trict court recognized, to convey an easement enforceable against the Tribe and the United States independent of their continuing consent. Thus the question whether the Indians could have conveyed an express license if that is what they intended [28] is not before us. We hold only that a license cannot be inferred from the attempted granting of an easement in violation of section 177.

## VIII. Conclusion

Although it may appear harsh to condemn an apparently good-faith use as a trespass after 90 years of acquiescence by the owners, we conclude that an even older policy of Indian law compels this result. Southern Pacific does not have and has never had a valid right-of-way across lands within the original 1874 executive order boundaries of the Walker River Reservation except through the lands ceded by the Tribe to the United States in 1906. Southern Pacific has never had a revocable license to operate a railway across the reservation. The case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

28. The only authority cited by the district court for the validity of Indian licenses is Cohen, Federal Indian Law, *supra,* at 332–33. Cohen states: "Where the parties intend to create a bare license to use and enjoy tribal property, there is no statute under which the licensee may be barred from the use of such property . . . ." *Id.* at 333. Cohen relies for the most part on some Attorney General opinions, *see* 18 Op.Atty.Gen. 34 (1884); 17 Op.Atty.Gen. 134 (1881), but concedes that "the practical absence of litigation in this field leaves us without an authoritative basis for answering many questions which might be put." *Id.*

Cohen also notes that some rights granted to non-Indians may be difficult to characterize; there is a hazy line, for example, between leas-

es, which give third persons exclusive rights to possession and which a tribe may not convey absent permissive statutes, and licenses, which are non-exclusive, non-possessory rights to use the lands of another. *Id.* Here, if the parties had not so clearly intended to convey an easement, we would face such an issue of characterization: should a permit to construct a railroad requiring a large capital investment which might not be recouped for many years of operation be construed as revocable at the will of the Indians? If some period of non-revocability is implied, is the interest then substantial enough that it may not be conveyed under section 177? Since the parties clearly intended an easement and not a license, these issues are not before us.