The ONEIDA INDIAN NATION OF NEW YORK STATE, also known as the Oneida Nation of New York, also known as the Oneida Indians of New York, and the Oneida Indian Nation of Wisconsin, also known as the Oneida Tribe of Indians of Wisconsin, Inc., and the Oneida of the Thames Band Council, Plaintiffs,

v.

The COUNTY OF ONEIDA, New York, and the County of Madison, New York, Defendants.

No. 70–CV–35.

United States District Court,
N. D. New York.

July 12, 1977.

Bond, Schoeneck & King, Syracuse, N.Y., for plaintiffs; George C. Shattuck, Syracuse, N.Y., of counsel.

Donald E. Keinz, Utica, N.Y., for defendant County of Oneida; James P. O'Rourke, Boonville, N.Y., of counsel.

William L. Burke, Hamilton, N.Y., for defendant County of Madison.

## MEMORANDUM–DECISION AND ORDER

PORT, Senior District Judge.

This case tests the consequences of the failure of the State of New York to comply with the provisions of the Indian Nonintercourse Act, enacted by the first Congress in 1790 and reenacted in substance by subsequent Congresses to the present date. 25 U.S.C. § 177. Familiarity with the prior opinions in the case is assumed.[1]

In 1795, the State of New York acquired from the Oneida Indians, by an instrument variously denominated as a deed or treaty, 100,000 acres in Central New York. The counties of Oneida and Madison have acquired and now occupy undesignated but small portions of that acreage. The claim made in this case is limited to damages for the use and occupancy during the years 1968 and 1969 of those "parts of said premises [currently occupied by defendants] for buildings, roads, and other public improvements."[2]

The issues can be summed up as follows: (1) Have the plaintiffs established that the transfer of land by the 1795 treaty to the State of New York was in violation of the Nonintercourse Act? (2) Have any of the defenses asserted by the defendants been established? (3) Are the defendants liable to the plaintiffs for damages resulting from defendants' use and occupancy of part of the subject land during 1968 and 1969? The answer to the first question is yes; to the second, no; and to the third, yes.

■ Although the present owners of the 100,000 acres may have acted in good faith when acquiring their property, such good faith will not render good a title otherwise not valid for failure to comply with the Nonintercourse Act.

Although it may appear harsh to condemn an apparently good-faith use as a trespass after 90 years of acquiescence by the owners, we conclude that an even older policy of Indian law compels this result.

*United States v. Southern Pacific Transportation Co.,* 543 F.2d 676, 699 (9th Cir. 1976). Furthermore, it is incumbent upon "[g]reat nations, like great men, [to] keep their word." *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 142, 80 S.Ct. 543, 567, 4 L.Ed.2d 584 (1960) (Black, J., dissenting).

The posture in which this case has been presented is reminiscent of *United States v. Forness,* 125 F.2d 928 (2d Cir.), *cert. denied,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942), in which the Second Circuit said:

> Although there is directly before us only one lease, on which the annual rent is but $4, the question is of greater importance because the Nation, by resolution, has cancelled hundreds of similar leases.

*Id.* at 930. Likewise, the impact of the Oneidas' claim will reach far beyond the boundaries of the present suit. In my initial decision dismissing the claim for lack of jurisdiction, I pointed out that, "it obvious that there are, of necessity, numerous other parties occupying the balance of the 100,000 acre parcel under title derived from New York State, against whom . . . claims could be made." *Oneida Indian Nation v. County of Oneida,* 70–CV–35, slip op. at 9 n. 3 (N.D.N.Y., November 9, 1971).

Nor is the problem limited to this case,[3] this particular land transaction, the Oneida Indian Nation, or even this area. Other Indian tribes have similar claims[4] in several

---

1. *Oneida Indian Nation v. County of Oneida,* 70–CV–35 (N.D.N.Y. November 9, 1971), *aff'd,* 464 F.2d 916 (2d Cir. 1972), *rev'd,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).

2. Plaintiffs' amended complaint ¶ 22.

3. The Oneida Nations presently have two other actions pending in this district. *Oneida Indian Nation v. County of Oneida,* 74–CV–187 (N.D.N.Y.) (action for damages challenging some 25 treaties with New York State); *Oneida Indian*

*Nation v. Williams,* 74–CV–167 (N.D.N.Y.) (action for ejectment against 23 landowners).

4. These Indian claims have not all been pursued through the orderly mechanism of litigation. *See New York v. White,* 528 F.2d 336 (2d Cir. 1975). *White* arose out of the seizure of land in the Adirondacks by members of the Mohawk and other Indian tribes.

other states. Litigation brought by the tribes themselves,[5] or by the federal government in their behalf,[6] is already pending. Further suits brought by the United States are imminent. The Department of Justice has alerted the United States Marshal for this district that, unless Congress extends the statute of limitations for such suits beyond July 18, 1977,[7] an action on behalf of the Cayuga and St. Regis Mohawk tribes will be commenced immediately. The Marshal was given this advance notice because it is anticipated that the suit will involve some 10,000 defendants. The potential for disruption in the real estate market is obvious and is already being felt. News reports indicate that title companies have refused to insure titles in areas where Indian land claims exist, even if law suits have not yet been commenced.

 The greater part of the disruption and individual hardships caused by litigation such as this could be avoided by seeking solutions through other available vehicles. This in no way is intended to be critical of the plaintiffs' conduct. The trial of this case demonstrated that they have patiently for many years sought a remedy by other means—but to no avail. The aid of the United States as guardian has been sought for the purpose of instituting claims against the State of New York, to challenge not only the 1795 sale but other treaties with the state.[8] The remedy afforded by Congress against the United States for alleged breach of trust has been and is presently being pursued before the Indian Claims Commission.[9] Finally, it is within the power of Congress to dispose of the matter under the constitutional delegation of power.[10]

**5.** *Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899 (D.Mass.1977); *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780 (D.Conn.1976); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798 (D.R.I.1976).

**6.** *See Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir. 1975) (*Passamaquoddy*).

**7.** *See* 28 U.S.C. § 2415.

**8.** *See* Tr. 198–99; Exhs. 46–48, 51. The parties have advised the court that the United States plans to institute a suit on behalf of the Oneidas to prosecute the tribe's land claims. *Compare, Passamaquoddy, supra* note 6.

**9.** The progress of the Oneidas' action in the Indian Claims Commission can be ascertained by reference to the opinions of the Commission. *See* 26 Ind.Cl.Comm. 138 (Aug. 18, 1971); 37 Ind.Cl.Comm. 522 (Mar. 19, 1976), and the intervening opinion of the Court of Claims, *United States v. Oneida Nation of New York,* 477 F.2d 939, 201 Ct.Cl. 546 (1973).

In their answer, defendants raised as an affirmative defense the pendency of proceedings before the Indian Claims Commission. They allege that, "[t]his issue is presently before the . . . Commission." Defendants' answers ¶ 11. The simple rejoinder to this defense is that the same issue is not before this court and the Commission. The case at bar challenges the validity of the 1795 purchase of Oneida land; it seeks money damages from the defendants, present landowners who allegedly lack

valid title to the land. The suit in the Indian Claims Commission charges the United States with breach of its fiduciary duty to protect the Oneidas in land dealings with the State of New York. *United States v. Oneida Nation of New York,* 477 F.2d 939, 201 Ct.Cl. 546 (1973). Although these are separate claims, recovery against the United States might well render any other suit academic.

A more important question, whether the Indian Claims Commission was created to provide an exclusive remedy for redress of wrongs to the Indian nations, was not raised by defendants but deserves comment. The Indian Claims Commission was created in 1946 "to right a continuing wrong to our Indian citizens", H.R.Rep.No.1466, 79th Cong., 2d Sess. (1945); 1946 U.S.C.C.S. 1347, by creating a forum for Indian claims against the United States. The legislative history makes clear that the Commission was to consider only claims against the United States; no intent to supplant Indian claims against other parties, governmental or private, is evidenced. In discussing the nature of the claims to be considered by the Indian Claims Commission, the House Report mentions solely claims against the federal government. *See Id.* Section 1; 1946 U.S.C.C.S. 1350–51.

**10.** *See* U.S.Const. art. I, § 8; *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960); *United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *cf. Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

The aptness of what was recently said by Chief Judge Kaufman is striking. "As in so many cases in which a political solution is preferable, the parties find themselves in a court of law." *British Airways Board v. Port Authority of New York and New Jersey,* 558 F.2d 75 at 78 (2d Cir. 1977).

## I. NATURE OF THE PROCEEDING

The Oneida Indian Nations are suing for damages arising from the allegedly illegal use and occupancy of a part of their aboriginal land. In 1795, the State of New York purchased a large tract of the aboriginal land of the Oneida Nation. Plaintiffs claims that this purchase violated United States treaties and the Indian Nonintercourse Act, 25 U.S.C. § 177. Therefore, plaintiffs contend that the purchase was void and of no effect.

Part of the 1795 purchase is now occupied by the defendant counties. Plaintiffs measure their damages by the fair rental value of such land for the years 1968 and 1969, the period covered by the complaint.

## II. BACKGROUND

The action was commenced in 1970. Following a motion for summary judgment by the defendants, this court dismissed the action for lack of federal jurisdiction. It was decided that diversity of citizenship was absent, 28 U.S.C. § 1332, and that federal question jurisdiction was lacking because the case did not "[arise] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a). This court held that the federal question failed to appear on the face of the complaint; it only appeared in anticipation of various defenses. The Court of Appeals affirmed, holding that the jurisdictional claim "shatters on the rock of the 'well-pleaded complaint' rule." *Oneida Indian Nation v. County of Oneida,* 464 F.2d 916, 918 (2d Cir. 1972). However, the Supreme Court reversed, stating that plaintiffs'

> assertion of a federal controversy . . . rests on the not insubstantial claim that

federal law now protects, and has continuously protected from the time of the formation of the United States, possessory right to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession.

*Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 677, 94 S.Ct. 772, 782, 39 L.Ed.2d 73 (1974). Because the "Oneidas assert a present right to possession based in part on their aboriginal right of occupancy", *Id.,* the complaint on its face raises a federal question.

After remand, plaintiffs moved for summary judgment, but the motion was denied summarily. I held that summary judgment was inappropriate in such a complex and far-reaching case; a full exploration of all the facts was in order. However, trial of the issues was trifurcated. The parties agreed to try the issue of liability first, reserving the question of damages and that of liability of the State of New York to the defendant counties for later disposition.[11] Subsequently, the plaintiffs developed their proof, largely through documentary exhibits, in a three day trial. The defendants, relying only on the plaintiffs' proof and the law, submitted no evidence.

## III. FACTS

*The Parties*

Originally, there were two plaintiffs, the Oneida Indian Nation of New York and the Oneida Indian Nation of Wisconsin. During the trial, plaintiffs moved to amend their complaint to join the Oneida of the Thames Band Council, a band of Oneidas from Ontario, Canada, as party plaintiffs. The motion was granted.

The three plaintiffs are the direct descendants of the Oneida Indian Nation which inhabited Central New York prior to the Revolutionary War. According to expert testimony, this conclusion is supported by extensive research into the kinship and genealogies of the Oneida Nation. (Tr. 63–66, 163–65). Furthermore, the United

---

11. Transcript (Tr.) 8–9.

States is presently paying annuities, which are owed to the Oneida Nation under the Treaty with the Six Nations, executed on November 11, 1794, to the Oneidas in New York and Wisconsin. The Wisconsin Oneidas receive their payments in cash, and the New York Oneidas in cloth. (Tr. 25–26). Also, the Bureau of Indian Affairs recognizes both the Wisconsin and New York Oneidas as the successors in interest to the Oneida Nation of 1794. (Tr. 26, Exh. 49).

This finding is not disturbed by defendants' allegations that the present leadership of the Oneida Nation of New York is in dispute. Regardless of which individuals hold office within the tribe, the tribe is recognized as the direct descendant of the Oneida Nation which inhabited New York 200 years ago. Nothing else is required.

The defendants are the Counties of Oneida and Madison. The parties agree that the defendants now occupy and claim to be the record owners of part of the aboriginal Oneida land, more specifically, part of that area of Oneida land purchased by New York State in 1795.

*Historical Background*

The Oneidas' aboriginal land ran from the Pennsylvania border north to the St. Lawrence River, from the shores of Lake Ontario to the western foothills of the Adirondack Mountains. (Tr. 69). This region can be described as a band, about fifty miles wide, running north-south through eastern central New York. According to the records of the earliest white missionaries who came to upstate New York, the Oneidas were occupying this land during the early 17th Century. (Tr. 69, 137). They continued to occupy this land until shortly after the birth of the United States.

During the Revolutionary War, the Oneidas fought alongside the Colonists against the British. (Tr. 73). Aside from their service as scouts and their active participation in various battles in upstate New York, the Oneidas performed another valuable function for the Colonies—they prevented the Six Nations or Iroquois from taking a unified stand as allies of the British. (Tr. 73). The Iroquois were the most influential and powerful tribe in the Northeast and had traditionally been an ally of the British.[12] At the outset of the Revolutionary War, the Colonial government sought to secure the neutrality of the Iroquois. Although this result was not achieved, at least the Iroquois did not fight in unison against the Colonists. Because the Oneidas and Tuscaroras allied themselves with the Colonists, the Six Nations put out the council fires and permitted each nation to choose its ally independently.

After the War, the new nation sought to reward and protect its valuable ally, the Oneida Nation. The Treaty of Fort Stanwix, executed in 1784 to make peace with the Six Nations, expressly secured the Oneidas "in the possession of the lands on which they are settled." (Exh. 1).[13] A few years later, in further thanks for their help, the federal government commissioned, post facto, several Oneidas as officers in the United States Army. (Tr. 88, Exh. 11). Twice again, in treaties between the Six Nations and the United States, the federal government secured the Oneidas in the possession of their land.[14]

However, in 1788, because of increasing pressures to open up the Oneidas' land to settlement, the State of New York purchased the great majority of the Oneidas' land from them. They were left with a reservation of about 300,000 acres in the area southwest of Oneida Lake. This reservation is outlined in Exh. 7 and the parties have stipulated that the land involved in this suit lies within the boundaries of this 1788 reservation.

**12.** *See F. Cohen, Handbook of Federal Indian Law* 417–418 (University of New Mexico Press reprint of 1942 Ed.) (hereinafter, *Federal Indian Law*).

**13.** Treaty of Fort Stanwix (October 22, 1784) 7 Stat. 15.

**14.** Treaty at Fort Harmar (January 9, 1789) 7 Stat. 33 (Exh. 3); Treaty with the Six Nations (November 11, 1794) 7 Stat. 44 (Exh. 4).

534

In 1790, Congress passed the first Indian Nonintercourse Act (the Act). That statute prohibited any land transactions with Indian tribes that were not executed by public treaty under the authority of the United States. 1 Stat. 137–38 (Exh. 10). In 1793, the Act was amended into substantially its present form. The gist of the Act remains the same—unless by treaty with the United States or under the authority of the United States, no purchase or grant of land from an Indian tribe "shall be of any validity." 25 U.S.C. § 177.

*The 1795 Purchase*

By 1795 a conflict had developed between the United States and the State of New York over the State's power to negotiate purchases of land from the Oneidas. The federal policy toward the Oneidas remained the same—the government intended to reward them for past services and to protect them from predation by the white settlers. (Exhs. 17, 19). New York, however, desired to purchase the Oneidas' land, along with the land of many other Indian nations within its borders. Secretary of War, Timothy Pickering, wrote to United States Attorney General William Bradford for an opinion on whether or not New York had the power to purchase Indian land without the intervention of the United States government. The Attorney General responded by stating the language of the Nonintercourse Act was "too express to admit of any doubt upon the question." (Exh. 22). The Act applied to New York. In his opinion Bradford did not question New York's right to land ceded to the State by treaty entered into prior to the adoption of the Constitution of the United States. However, as to the land reserved to the Oneidas under those treaties, he held that the Oneidas' rights could not be extinguished except "by a treaty holden under the authority of the United States, and in the manner prescribed by the laws of Congress." (Id.)

Pickering had been informed that New York was attempting to purchase land from the Cayuga, Onondaga and Oneida Nations. In June of 1795, he wrote to Israel Chapin,

Jr., Superintendent of the Affairs of the Six Nations, ordering him not to aid New York in these purchases. Chapin was further instructed to warn the Six Nations of the illegality of any such transactions with New York. Finally, noting that New York's Governor Clinton refused to request federal commissioners, Pickering hoped that the situation would improve when the new governor, John Jay, took office. (Exh. 24). The hope remained only a hope. In July, Jay wrote Pickering that, "on *this* occasion I think I should forbear officially to consider and decide" whether the "Act of 1 March 1793" was constitutional or whether the conduct of New York violated either the United States Constitution or the 1793 Nonintercourse Act. He observed, however, that under the New York Constitution, transactions with Indian tribes must be pursuant to acts of the Legislature; that the enabling legislation in this instance was silent "[a]s to any intervention or concurrence of the United States", nor did it "by implication direct or authorize the Governor to apply for such intervention." (Exh. 26). Jay noted that arrangements for the meeting with the Six Nations planned for later that summer were finished "before I came into office." (Id.)

Within a week, however, Jay wrote Pickering and requested the appointment of United States Commissioners to negotiate a treaty between New York and the St. Regis Indians. (Exh. 28). In a letter to President Washington, suggesting that a commissioner be appointed for the treaty with the St. Regis, Pickering pointed out New York's inconsistent policy for negotiating with Indians. The State was complying with statutory requirements for the St. Regis, but refused to do so when dealing with the Six Nations. (Exh. 29). The reasons for these differing approaches are nowhere made specific. However, Dr. Jack Campisi, a professor of anthropology and an expert on the Oneida Nations, suggested why New York acted as it had. He stated that New York perceived a difference in federal treatment of different Indian tribes. Since the Oneidas and the United States had been allies, the federal government felt bound to pro-

tect their interests. Tribes that had allied with the British received less federal protection. Consequently, New York complied with the Nonintercourse Act when negotiating with previously hostile Indians, but refused to do so when dealing with the friendly Oneidas. The State feared excessive federal protective intervention in the latter case.

In July, New York purchased the Cayuga and Oneida reservations for sums to be paid annually. The tribes were left with small parcels of land. (Exh. 31). When the New York Commissioners then moved on to the Village of Oneida, intending to purchase the Oneidas' land, Chapin travelled to Oneida hoping to dissuade the Indians from dealing with the State. (*Id.*). At Oneida, he informed the tribe of the federal government's opinion of the illegality of such a transaction. (Exh. 32). He remained there for nine days and no deal was made. After leaving Oneida, Chapin was informed that the state commissioners left two days later, having been unable to reach any agreement with the tribe. (*Id.*). Late in August, Pickering wrote Chapin and informed him that he had acted properly in warning the Oneidas of the illegality of any purchase by New York. However, Pickering then told Chapin that "having done this much, the business might there be left." (Exh. 33). Chapin was instructed to leave matters as they stood.

Despite another letter from Pickering to Governor Jay, outlining the procedure to be followed under the Nonintercourse Act of 1793 (Exh. 34), the State continued to negotiate with the Oneidas. These negotiations culminated in a sale contrary to the provisions of the Act on September 15, 1795 by the Oneidas of approximately 100,000 acres of their reservation. (Exhs. 6, 35). The papers transferring the land were signed at Albany, which was not within the boundaries of the Oneidas' aboriginal land. (Exh. 35). Although the Six Nations had met with the British at Albany, the Oneida Nation had never before executed any treaty or land transaction there. (Tr. 111a–112a).

Another irregularity in the transaction appears from the record. Ordinarily, treaties were entered into by tribal consensus (Tr. 188–89), by unanimous decision of the tribe. In this case, powers of attorney were executed enabling certain individuals, none of them chiefs, to negotiate the transaction at Albany. (Tr. 189). Also, although women were not allowed to speak at the tribal council (Tr. 190), half of those Oneidas signing the power of attorney were women. (Tr. 189). Finally, the names of the sachems and chiefs that appear on the September 15, 1795 document were not the signatures of Oneida chiefs. Rather, the signatories of the documents merely used the traditional Oneida names for their sachems and chiefs. (Tr. 192).

In the opinion of Dr. Campisi, no United States Commissioner was present in Albany when the State purchased this land from the Oneidas. (Tr. 126). Superintendent Chapin's expense account shows no expenses incurred in Albany in September of 1795. (Exh. 36). Defendants have presented no evidence demonstrating or even suggesting that a United States Commissioner was present. There is no record that Governor Jay ever requested a commissioner for this transaction. The only finding permitted by the record before me is that no United States Commissioner or other official of the federal government was present at the September 15, 1795 transaction.

*Developments after 1795*

After 1795, New York State continued to negotiate with the Oneidas for the purchase of their land. Between 1795 and 1846, 25 treaties were executed between the State and the Oneida Nation. Only two of these treaties were conducted under federal supervision as required by the Nonintercourse Act.[15] By 1846, the Oneidas' landholdings in New York had been diminished to a few hundred acres. (Tr. 267).

The social and economic pressures on the Oneidas naturally resulted in the alienation of their land. (Tr. 127–131). In addition,

**15.** *See United States v. Oneida Nation of New York,* 477 F.2d 939, 201 Ct.Cl. 546 (1973).

white settlers living in the areas continually encroached on the Oneidas' land. (Tr. 232–233). Land speculators were always urging the Oneidas to sell their reservations. At the same time, New York began agitating for the removal of the Oneidas and other Indians to western lands.[16] The policy of removal was not universally accepted among the Oneidas, and the problem was exacerbated by the efforts of outsiders, clergy and advisors, to urge the Oneidas to move west. (Tr. 131). The Oneida Nation was split into several factions by these pressures. As a result, by the 1840's, three distinct bands of Oneidas existed. One band stayed on the remaining Oneida reservation land in New York; one group of almost 600 had settled on about 65,000 acres in Wisconsin; and another group of about 400 had moved to Ontario, Canada.

Unfortunately, the pressures on the Oneidas to part with their land did not cease once removal had been effected. The Oneidas' meager landholdings in New York were reduced further as a result of a New York statute which divided the tribal landholdings and gave the Oneidas an option to sell their land. (Tr. 227). This option to sell, coupled with the state of extreme poverty in which they lived, more or less forced the sale of much of the remaining Indian land. The loss of land in Wisconsin was much more drastic. In 1887, the Dawes Act, or General Allotment Act, was enacted by Congress. (24 Stat. 388, February 8, 1887). This Act broke up tribal landholdings, distributed individual parcels to individual Indian families, and removed restrictions on the transfer of title.[17] Again, because of the poverty of the Oneidas, they then lost their land through sales, tax sales, or mortgage foreclosures. By the time of the depression, the extent of the Wisconsin Oneidas' landholdings had decreased from 65,000 acres to approximately 600. (Tr. 132, 203, 220).

These forces which acted to deprive the Oneidas of their land had a similar adverse impact on the social conditions of the Onei-

da Nation. After the Revolutionary War, the Oneida Nation was extremely disorganized because of the displacements which had occurred during the many years of fighting, first against the French and later against the British. (Tr. 128). The tribe was suffering from famine and widespread alcoholism. (Tr. 130). The poverty they then experienced became locked in a vicious circle with the loss of their land. These problems were complicated by the Oneidas' illiteracy. Prior to 1800, at the time the great mass of their land was lost, only a few Oneidas had even a minimal ability to understand English orally. (Tr. 129). None could read or write. This state continued through the early 1800's, during the time of removal. (Tr. 218). In fact, up through the 1950's, a translator was needed at meetings of the Oneida Nation of Wisconsin in order to explain actions of the federal government. (Tr. 225). The modest attempts to educate the Oneidas must be viewed, in retrospect, as failures. There were schools established by missionaries on the New York reservation by 1796 and on the Wisconsin land by 1907. (Tr. 264). However, these schools had little or no impact on the Oneidas' illiteracy. It was not until 1928 that the first person graduated from the eighth grade from the mission school for the Oneidas in Wisconsin. (Id.)

Despite these conditions of poverty and illiteracy, and although their attempts to redress grievances were totally futile, the Oneidas did protest the continuing loss of their tribal land. These efforts were not documented prior to 1909. However, expert witnesses testified that between 1840 and 1875 the Oneidas often attempted to petition the federal government. (Tr. 234). Usually, such petitioning was conducted through the Oneidas' Indian agent. On one occasion, in 1874, a group of Oneidas travelled from Wisconsin to Albany, New York and consulted with a private law firm. All of these efforts were to no avail. (Tr. 234–38). Between 1909 and 1965, the Oneidas contacted the federal government innu-

---

**16.** *Federal Indian Law* 420.

**17.** *Id.* at 206–17.

merable times in connection with land claims and other grievances. (*See* Exhibits 54, 55).

## IV. PLAINTIFFS' CLAIM

The plaintiffs' claim is uncomplicated. The complaint alleged that from time immemorial down to the time of the American Revolution the Oneidas had owned and occupied some six million acres of land in the State of New York. The complaint also alleged that in the 1780's and 1790's various treaties had been entered into between the Oneidas and the United States confirming the Indians' right to possession of their lands until purchased by the United States [18] and that in 1790 the treaties had been implemented by federal statute, the Nonintercourse Act, 1 Stat. 137, forbidding the conveyance of Indian lands without the consent of the United States. It was then alleged that in 1788 the Oneidas had ceded five million acres to the State of New York, 300,000 acres being withheld as a reservation, and that in 1795 a portion of these reserved lands was also ceded to the State. Assertedly, the 1795 cession was without the consent of the United States and hence ineffective to terminate the Indians' right to possession under the federal treaties [19] and the applicable federal statutes. Also alleging that the 1795 cession was for an unconscionable and inadequate price and that portions of the premises were now in possession of and being used by the defendant counties, the complaint prayed for damages representing the fair rental value of the land for the period January 1, 1968, through December 31, 1969.

18. See notes 13 and 14 *supra*.

19. Plaintiffs claim relief under both the Treaty and the Nonintercourse Act. Since relief is afforded under the statute, it is unnecessary to decide whether the plaintiffs are afforded a claim against these defendants for the alleged treaty violation.

*Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 663–65, 94 S.Ct. 772, 775, 39 L.Ed.2d 73 (1974) (footnote omitted).

## V. NONINTERCOURSE ACT VIOLATION

Since its enactment in 1790 to the present time, the Nonintercourse Act has not materially changed. It is now codified at 25 U.S.C. § 177. It provides:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

*Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899 (D.Mass.1977) (*Mashpee*), is an action similar to this case. The plaintiff tribe seeks a declaratory judgment establishing its right to certain land in Massachusetts allegedly obtained from it in violation of the Nonintercourse Act. In addressing a motion to dismiss the complaint, the court stated that in order to establish a prima facie case,

. . . plaintiff must show that:
1) it is or represents an Indian "tribe" within the meaning of the Act;
2) the parcels of land at issue herein are covered by the Act as tribal land;

3) the United States has never consented to the alienation of the tribal land;

4) the trust relationship between the United States and the tribe, which is established by coverage of the Act, has never been terminated or abandoned.

*Id.* at 902.

In considering these four factors, attention will focus principally upon the facts relating to the Oneida Indian Nation of New York.[20]

■ The Oneida Indian Nation of New York has clearly established itself as a tribe within the meaning of the Nonintercourse Act. It is a tribe presently recognized by the Bureau of Indian Affairs.[21] The New York Oneidas still receive annuities under the 1794 Treaty with the Six Nations.[22] Furthermore, they, and the other plaintiffs as well, are the direct descendants of the Oneida Indian Nation which inhabited the area in question before and after the passage of the first Nonintercourse Act. The Act was intended to protect the Oneida Nation. *See Joint Tribunal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975) (*Passamaquoddy*).

■ The land involved is covered by the Act. The land purchased in 1795 was part of an area reserved for the Oneidas in an earlier treaty with New York State and occupied by them at the time of the enactment of the first Nonintercourse Act. The tract was part of the Oneidas' aboriginal land. The Supreme Court has specified that Indian title in their aboriginal land is entitled to federal protection. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666–69, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). Furthermore, this land was secured to the Oneidas in three treaties with the United States, including the 1794 Treaty with the Six Nations.[23] The aboriginal home land of the Oneidas, later confirmed in treaties with the United States Government, is certainly land covered by the Nonintercourse Act, 25 U.S.C. § 177. Therefore, a fiduciary relationship exists between the plaintiffs and the United States. *United ed States v. Oneida Nation of New York,* 477 F.2d 939, 201 Ct.Cl. 546 (1973).

■ The proof clearly establishes that the United States never consented to the 1795 purchase. No United States commissioner was present in Albany when New York consummated this cession.[24] In fact, the federal agent for the Six Nations, Israel Chapin, Jr., had earlier traveled to Oneida to dissuade the Indians from dealing with New York. No evidence of any subsequent treaty or act of Congress ratifying the transaction was offered. The federal consent required by the Nonintercourse Act was not obtained before or after the fact.

■ Defendants argue that federal consent to this purchase was manifested by the subsequent conduct of the United States government. Defendants first raise the broad claim that the federal policy of removal of the Indians[25] validated the 1795 transfer. This broad argument misconceives the nature of Congressional approval required. Termination of Congressional responsibility under the Nonintercourse Act must be explicit. "[A]ny withdrawal of trust obligations by Congress would have to have been 'plain and unambiguous' to be effective." *Passamaquoddy, supra,* 528 F.2d at 380 (footnote omitted). *See also United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 346, 62 S.Ct. 248, 86 L.Ed. 260 (1941). Adoption of defendants' argument would emasculate the Nonintercourse Act. The policy of removal, in and of itself, did not effect ratification. Neither did the government's alleged awareness of subsequent transactions between the Oneidas and New York State, *see United States v.*

---

**20.** Since this phase of the trial is solely to determine liability, the rights of the individual plaintiffs to share in a recovery can be left for another day.

**21.** Tr. 26.

**22.** Tr. 25–26.

**23.** See notes 13 and 14 *supra.*

**24.** See text *supra* at 12–13.

**25.** *See Federal Indian Law* 420.

*Oneida Nation of New York,* 477 F.2d 939, 201 Ct.Cl. 546 (1973), constitute a ratification of the 1795 purchase. Again, defendants can point to no "plain and unambiguous" expression of federal approval.

Defendants see in the 1838 Treaty of Buffalo Creek[26] and its treatment in *New York Indians v. United States,* 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898), "an explicit recognition and implicit ratification"[27] by Congress of the 1795 purchase, among others. They see a mirage rather than an oasis. The federal government's policy of removal began affecting the Oneidas shortly after 1810. Initially, some Oneidas moved to Wisconsin, where they received a large tract of land ceded by the Menominee and Winnebago tribes.[28] Other Oneidas moved to Canada.[29] The Wisconsin land with some exception was later "cede[d] and relinquish[ed] to the United States" in exchange for a large tract of land in Kansas. Treaty of Buffalo Creek, Article 1, 7 Stat. 551.

An examination of the Buffalo Creek Treaty and the *New York Indians* case fails to support the defendants' interpretation. On its face, the Treaty of Buffalo Creek ceded Indian rights in land in Wisconsin only; no mention was made of Oneida land in New York State. Neither is there any mention of the 1795 agreement with New York. This is a particularly significant omission in view of the strenuous efforts made by the United States through President Washington and Secretary of War Pickering to enforce compliance with the Nonintercourse Act. (*See* Exhs. 17, 24). In light of the diametrically opposed views of the Governor of New York and the Central Government as to the applicability of the Nonintercourse Act to the 1795 transaction, (*compare* Exh. 22 *with* Exh. 26), it is hardly likely that the Treaty of Buffalo Creek would have ratified the agreement implicitly instead of expressly. Had there been a desire to legitimatize a transaction theretofore regarded as a contravention of the Nonintercourse Act, the opportunity was presented without question by the Treaty of Buffalo Creek. Article 13, headed "Special Provisions for the Oneidas Residing in the State of New York", 7 Stat. 554, not only presented a logical and convenient place for such a provision, but even suggested it if the parties, in fact, had it in mind. Furthermore, there was resistance among the Oneidas to the removal policy initially,[30] and to the arrangements specified in the Treaty of Buffalo Creek. This resistance to removal was a factor that brought about the dispute resulting in the *New York Indians* case.

> The difficult point in the case, in its equitable aspect, is whether the protests of the Indians and their final refusal to remove in 1846 do not estop them from claiming the benefit of the reservation made for them [in Kansas].

*New York Indians,* supra, 170 U.S. at 28, 18 S.Ct. at 538.[31]

**26.** Treaty of Buffalo Creek (January 15, 1838) 7 Stat. 550.

**27.** Defendant County of Madison's Post-Trial Memorandum 32.

**28.** *See Federal Indian Law* 420

**29.** Tr. 130–32, 163–65.

**30.** Tr. 130–32.

**31.** Defendants' assertion that the Court of Claims' opinion in *New York Indians v. United States,* 40 Ct.Cl. 448 (1905), established either federal ratification of the 1795 purchase or abandonment of the Oneidas' New York land is equally unsupportable. That opinion merely decided which Indians would participate in the award of damages for the disposition of their reservation in Kansas. The right to such damages had been established by the Supreme Court in *New York Indians v. United States,* 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898). The Court of Claims held that the Ontario Oneidas were entitled to share in the recovery. At no point did the court find that the New York Oneidas had abandoned their rights to their land in New York. In discussing the unsuccessful nature of the Treaty of Buffalo Creek, the Court noted that:

> None of the tribes moved or was removed to the country set apart; none of them made a demand or request for removal; some of them positively refused to remove when requested by agents and commissioners of the United States; others of them denied that they were parties to the treaty and averred that it had been procured in their names by corruption and fraud.

In a similar context, the Supreme Court refused to infer that Congress extinguish the Walapais Indians' rights in their aboriginal land when it established a new reservation for the Walapais and other Indian tribes.

> We find no indication that Congress by creating that reservation intended to extinguish all of the rights which the Walapais had in their ancestral home. That Congress could have effected such an extinguishment is not doubted. But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards. As stated in *Choate v. Trapp,* 224 U.S. 665, 675, [32 S.Ct. 565, 569, 56 L.Ed. 941], the rule of construction recognized without exception for over a century has been that "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith."

*United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 353–54, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941) (footnote omitted).

 The fourth element is proof that the trust relationship between the Oneidas and the United States was never terminated or abandoned.[32] The uncontradicted evidence establishes that this is so. The Oneidas are today a federally recognized Indian nation.[33] Furthermore, they continue to receive annuities under the 1794 Treaty with the Six Nations.[34] Defendants have introduced no evidence whatsoever of any plain

and unambiguous withdrawal of Congress' trust obligations. See *Passamaquoddy, supra,* 528 F.2d at 380.

A prima facie case of violation of the Nonintercourse Act, 25 U.S.C. § 177, has been established.

 Two additional points urged by the defendants should be noted. In reliance on *United States v. Franklin County,* 50 F.Supp. 152 (N.D.N.Y.1943), defendant County of Oneida construes the Nonintercourse Act as exempting from its coverage states "having a right of preemption", such as New York. In the light of later decisions, this holding of *Franklin County* cannot be considered authoritative. "The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent shall apply in all of the states including the original 13." *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 670, 94 S.Ct. 772, 778, 39 L.Ed.2d 73 (1974); *see also United States v. Oneida Nation of New York,* 477 F.2d 939, 943–44, 201 Ct.Cl. 546 (1973); *Seneca Indian Nation v. New York,* 397 F.Supp. 685 (W.D.N.Y.1975).

*Franklin County's* description of the Act as "at most regulatory, designed to prevent fraud", *Franklin County, supra,* 50 F.Supp. at 156, and that conclusion that the Act, by its terms, does not require the presence of a United States Commissioner at a treaty as "a prerequisite to its validity", *Id.,* is also urged. The plaintiffs contend that a purchase of land in violation of the act is totally void, whether the Indian nation was defrauded or whether the consideration paid for the land was inadequate.[35] The

---

*New York Indians v. United States,* 40 Ct.Cl. 448, 451 (1905).

**32.** The essential elements of a prima facie case under the Nonintercourse Act trace their ancestry to *Passamaquoddy, supra.* *See Mashpee, supra,* 427 F.Supp. at 902. Obviously, this fourth element was essential to plaintiffs' claim in *Passamaquoddy,* for the main issue there was whether a trust relationship existed between the United States and the Passamaquoddy tribe. Although I entertain doubts as to the need for proof of this element in an action brought by the tribe itself, the question is academic in this case since the trust relationship

between the United States and the Oneidas has clearly never been terminated or abandoned.

**33.** Tr. 26, Exh. 49.

**34.** Treaty with the Six Nations (November 11, 1794) 7 Stat. 44. *See* Tr. 25–26.

**35.** At a pre-trial conference, it was stipulated that inadequacy or lack of consideration is not relevant to either plaintiffs' claims or defendants' affirmative defenses, insofar as issues of liability are concerned. This stipulation does not extend to the damages phase of the trial. (Tr. 7).

language of the statute and cases which consider other transfers of restricted Indian land compel the conclusion that the statute renders the 1795 purchase void.

The Nonintercourse Act states that no purchase of Indian land, unless made by treaty or convention pursuant to the Constitution, "shall be of *any validity* in law or equity." 25 U.S.C. § 177 (emphasis added). Any person not employed or authorized by the United States Government who even attempts to negotiate such a purchase can be fined. *Id.* The language of Congress is plain. The statute makes no reference to overreaching or fraud or inadequate consideration. By prohibiting all unauthorized dealings with Indians, it cuts off any inquiry into the fairness of such dealings insofar as the validity of the resulting transfer is concerned.

When Indian land has been transferred contrary to the terms of Congressional enactment, the Supreme Court has not hesitated to void the transaction. In *Bunch v. Cole,* 263 U.S. 250, 44 S.Ct. 101, 68 L.Ed. 290 (1923), a Cherokee Indian leased his land in violation of Congressional restrictions. The Court held the lease void and further held that an Oklahoma statute creating a tenancy-at-will was invalid as applied to the land. In *Ewert v. Bluejacket,* 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858 (1922), a Quapaw Indian sold allotted land in accordance with a statute permitting alienation but prohibiting any person such as the purchaser, an Indian agent, from having "any interest or concern in trade with the Indians." Rev. Stat. § 2078. The Court held the purchase void and remanded for an accounting. 259 U.S. at 138, 42 S.Ct. 442. *See also Smith v. McCullough,* 270 U.S. 456, 46 S.Ct. 338, 70 L.Ed. 682 (1926). A recent case in the Ninth Circuit concluded that the Nonintercourse Act prohibited the Walker River Paiute Tribe from granting an easement to a railroad. *United States v. Southern Pacific Transportation Co.,* 543 F.2d 676 (9th Cir. 1976). In 1882, the railroad's predecessor negotiated with the Tribe and bought a right-of-way across its reservation without Congressional authorization. Ninety-four years later the agreement was held invalid.[36]

Although it may appear harsh to condemn an apparently good-faith use as a trespass after 90 years of acquiescence by the owners, we conclude that an even older policy of Indian law compels this result.

*Id.* at 699.

The result in the present case may seem equally harsh. Nevertheless, it is the result mandated by the Nonintercourse Act.

## VI. ABANDONMENT

Defendants argue that the plaintiffs abandoned the land involved in this suit, citing *Williams v. City of Chicago,* 242 U.S. 434, 37 S.Ct. 142, 61 L.Ed. 414 (1917). The facts of that case are instructive. In *Williams,* Pattawatomie Indians ceded their land around Lake Michigan *to the United States* and then moved west. Some fifty years later, they attempted to claim land which had originally been under Lake Michigan but had been reclaimed by the time of the suit. The Supreme Court held that the land under Lake Michigan, along with the rest of the aboriginal Pattawatomie land, had been abandoned. However, *Williams* is inapposite to the present case. The Oneida Indians never abandoned their claim to their aboriginal homeland. The small area of land they now occupy lies within the boundaries of the aboriginal land. Furthermore, they never acquiesced in the loss of their land, but have continued to protest its diminishment up until today.

## VII. THE PASSAGE OF TIME HAS NOT BARRED THIS SUIT

The violation of the Nonintercourse Act which gave rise to this suit occurred in 1795. Plaintiffs did not commence this action until 1970, 175 years later. Defendants argue that the passage of

---

**36.** The Ninth Circuit also considered whether or not the railroad acquired a license for its right-of-way under various Congressional statutes granting rights-of-way to railroads. *See United States v. Southern Pacific Transportation Co.,* 543 F.2d 676 (9th Cir. 1976).

time has barred this suit; they raise the defenses of statute of limitations,[37] laches, adverse possession and bona fide purchaser for value. Despite the extraordinary period of time which has passed, the action is not barred. The suit was commenced within the time permitted by 28 U.S.C. § 2415 which governs actions brought by the United States for or on behalf of Indian tribes. This period of limitations applies also to a case such as this one, brought by Indian tribes in their own behalf. Even assuming the necessity of fashioning a federal statute of limitations, Congress has supplied the model to be followed by Section 2415.

It is quite clear that state statutes of limitations and state laws of adverse possession and laches would not bar a suit brought by the United States on behalf of an Indian nation. Where the United States holds title to land in trust for Indians, adverse possession cannot run against the land. *United States v. 7,405.3 Acres of Land,* 97 F.2d 417 (4th Cir. 1938). Restrictions on the alienation of Indian land, which have their origin either in treaties or in land patents, are not weakened by the passage of time. Adverse possession and laches are no defense to a suit by the government to protect restricted land. "It has long been held that adverse possession under a state statute of limitations cannot run against Indians if the land is not alienable by them, so long as such restrictions exist." *United States v. Schwarz,* 460 F.2d 1365, 1371 (7th Cir. 1972); *see United States v. Ahtanum Irrigation District,* 236 F.2d 321 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). In *Ahtanum,* the Ninth Circuit pointed out the impact of the Nonintercourse Act on these defenses.

> And in respect to the rights of Indians in an Indian reservation, there is a special reason why the Indians' property may not be lost through adverse possession, laches or delay. This, as pointed out, in *United*

*States v. 7,405.3 Acres of Land,* 4 Cir., 97 F.2d 417, 422, arises out of the provisions of Title 25 U.S.C.A. § 177, R.S. § 2116, which forbids the acquisition of Indian lands or of any title or claim thereto except by treaty or convention.

*United States v. Ahtanum Irrigation District, supra,* 236 F.2d at 334 (footnote omitted).

Similarly, where individual Indians sue to rescind transfers of restricted Indian land, state defenses cannot render the transfers effective. In a suit to declare invalid a transfer of a restricted land patent, the Supreme Court held that laches was inapplicable. *Ewert v. Bluejacket,* 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858 (1922). Also, in an action for wrongful use and occupancy, a state statute which created a tenancy-at-will was held ineffective where Indian land had been leased in violation of Congressional restrictions. *Bunch v. Cole,* 263 U.S. 250, 44 S.Ct. 101, 68 L.Ed. 290 (1923). If a transfer of Indian land is void under federal law, *see, e. g.,* 25 U.S.C. § 177, it cannot later be made valid by operation of state law.

In the instant case, aboriginal Oneida land was transferred in violation of the Nonintercourse Act, 25 U.S.C. § 177. That statute declares, without any qualification, that no purchase made in violation of the Act "shall be of any validity in law or equity." The language of Congress could not have been plainer. Although this purchase occurred in 1795, it had no validity then nor does it today. New York's statute of limitations and the doctrines of laches, adverse possession, and bona fide purchaser cannot validate this transaction.

This same conclusion has been reached by two other district courts in suits brought to regain Indian land alienated in violation of the Nonintercourse Act. *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423

---

**37.** Defendants contend that the action is barred by two of New York's statutes of limitations: the six year statute of limitations governing actions "for which no limitation is specifically prescribed by law", *N.Y.C.P.L.R.* § 213(1) (McKinney 1972); and the one year and ninety day statute of limitations governing actions against a county, *N.Y.Gen.Munic.Law* § 50–i (McKinney 1965).

F.Supp. 780 (D.Conn.1976); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798 (D.R.I.1976). These cases emphasize the supremacy of federal law, which forbade the transfers, over state statutes which would validate them after the fact. The court in *Narragansett* went further. It noted that the United States, as sovereign, was not subject to these defenses. *See Narragansett, supra,* 418 F.Supp. at 805 and cases cited therein. It reasoned that the Congressional interests in protecting Indian land are the same, whether the United States or the Indians are plaintiffs. Thus, the Indians were permitted to assert the sovereign's interests and the defenses based on the passage of time were held inapplicable. It would be anomalous to permit the government, as trustee for the Indians, to achieve a result more beneficial to the Indians than the Indians could, suing on their own behalf. *See Schaghticoke, supra,* 423 F.Supp. at 785.

This conclusion does not necessarily eliminate the application of any statute of limitations. 28 U.S.C. § 2415 [38] provides a federal statute of limitations for cases brought by the United States for or on behalf of a recognized tribe of American Indians. Actions relating to restricted Indian lands are barred unless brought within 11 years of the date the claim accrued. Any claims which accrued prior to July 18, 1966, the date of the statute's enactment, are deemed to have accrued on the date of enactment. Although Section 2415 does not expressly include suits brought by Indian tribes *in haec verba,* it has been so construed. *Capi-*

---

**38.** The relevant portions of 28 U.S.C. § 2415 provide:

(a) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later: *Provided,* That in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment: *Provided further,* That an action for money damages brought by the United States for or on behalf of a recognized tribe, band or group of American Indians shall not be barred unless the complaint is filed more than six years and ninety days after the right of action accrued: *Provided further,* That an action for money damages which accrued on the date of enactment of this Act in accordance with subsection (g) brought by the United States for or on behalf of a recognized tribe, band, or group of American Indians, or on behalf of an individual Indian whose land is held in trust or restricted status, shall not be barred unless the complaint is filed more than eleven years after the right of action accrued or more than two years after a final decision has been rendered in applicable administrative proceedings required by contract or by law, whichever is later.

(b) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues: *Provided,* That an action to recover damages resulting from a trespass on lands of the United States; an action to recover damages resulting from fire to such lands; an action to recover for diversion of money paid under a grant program; and an action for conversion of property of the United States may be brought within six years after the right of action accrues, except that such actions for or on behalf of a recognized tribe, band or group of American Indians, including actions relating to allotted trust or restricted Indian lands, may be brought within six years and ninety days after the right of action accrues, except that such actions for or on behalf of a recognized tribe, band, or group of American Indians, including actions relating to allotted trust or restricted Indian lands, or on behalf of an individual Indian whose land is held in trust or restricted status which accrued on the date of enactment of this Act in accordance with subsection (g) may be brought within eleven years after the right of action accrues.

(c) Nothing herein shall be deemed to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property.

(g) Any right of action subject to the provisions of this section which accrued prior to the date of enactment of this Act shall, for purposes of this section, be deemed to have accrued on the date of enactment of this Act.

*tan Grande Band of Mission Indians v. Helix Irrigation District,* 514 F.2d 465 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975). Actually, whether the limitations of Section 2415 apply to suits brought by Indian tribes as well as the United States is irrelevant in this case. The plaintiffs' complaint was filed in 1970, well within the bar provided by the statute. *See Id.* at 472 (Miller, J., concurring).

## VIII. THE UNITED STATES IS NOT AN INDISPENSABLE PARTY

■ Defendants argue that the case must be dismissed for failure to join the United States as an indispensable party. They contend that the fiduciary relationship between the United States and the Indian nation, along with the general federal interest in Indian lands, requires that the United States be made a party to the action or that the action be dismissed. Neither Rule 19 of the Federal Rules of Civil Procedure, nor the adjudicated cases require such a result.[39] The Court of Appeals for the Tenth Circuit, faced with an almost identical situation, refused to dismiss the action. There, plaintiff Indian nations had sued to recover possession of land that was part of the tribes' communal allotment.

> If we hold that the United States is an indispensable party, the Nations will be unable to prosecute a suit to establish their title to, and recover the possession and use of, their lands predicated upon an alleged cause of action which arose more than twenty years ago. On the other hand, if they are permitted to prosecute the suit, in the absence of the United States, a judgment in favor of the defendants will not bind the United States. Defendants assert that that will result in a continuing cloud upon their titles. But, that is their present situation. So long as the United States fails to commence and prosecute to final judgment, an action to establish the title of the Nations to such lands and to recover possession thereof for the Nations, the title of the defend-

ants will continue to be clouded by the possibility of the United States thereafter bringing such an action. So it comes down to this: If we hold that the United States is an indispensable party, the Nations will be unable to assert their longstanding claim to the land; and if we hold that the United States is not an indispensable party, the defendants will run the risk of the burden and expense of defending two lawsuits, even though they succeed in obtaining a judgment in their favor in the instant action.

> We are of the opinion that the equities presented by the situation and the inconveniences that will result to the Nations, if they are denied the right to prosecute an action, and to the defendant, if the Nations are permitted to prosecute the action without the joinder of the United States, weigh heavily in favor of the Nations.

> We conclude that a final decree determining the title and right to possession as between the Nations and the defendants would not leave the controversy in a situation inconsistent with equity and good conscience.

*Choctaw and Chickasaw Nations v. Seitz,* 193 F.2d 456, 460–61 (10th Cir. 1951), *cert. denied,* 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952).

Two recent decisions in cases almost identical to this one, have held that the United States is not an indispensable party. *Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899 (D.Mass.1977); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798 (D.R.I.1976). These decisions were based on a long line of cases which have consistently held that, whenever Indian tribes or individual Indians sued to recover either tribal land or individual allotments, the United States is not an indispensable party. *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968); *Fort Mojave Tribe v. Lafollette,* 478 F.2d 1016 (9th Cir. 1973); *Jackson v. Sims,* 201 F.2d 259

---

**39.** For an analysis of the factors to be considered in connection with Fed.R.Civ.P. 19, *see*

*Prescription Plan Service Corp. v. Franco,* 552 F.2d 493 (2d Cir. 1977).

(10th Cir. 1953); *Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir. 1951), *cert. denied*, 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952). *See generally* 3A J. Moore, *Federal Practice* ¶ 19.09[8] at 2325 (2d Ed. 1974).[40]

Defendants cite cases that have reached the opposite conclusion for the general proposition that, whenever title to Indian land is involved, the United States is an indispensable party. *See Minnesota v. United States*, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939); *Carlson v. Tulalip Tribes of Washington*, 510 F.2d 1337 (9th Cir. 1975); *Nicodemus v. Washington Water Power Co.*, 264 F.2d 614 (9th Cir. 1959). However, these cases all involve attempts to burden land adversely to the interests of the Indians or the United States. These cases have found the United States to be an indispensable party because the United States owns the ultimate fee title to such land, and because a judgment adverse to the Indians could impair the rights of the United States in that fee. These cases differ from the instant suit by Indian tribes to recover aboriginal land, and this important distinction has been noted by the Tenth Circuit.

> In *Choctaw and Chickasaw Nations v. Seitz*, [citation omitted] we recognized the distinction between the indispensability of the Secretary of Interior in a suit, the effect of which would alienate Indian land, and the dispensability of the Secretary in a suit, the effect of which would protect Indian land against alienation, particularly where the Secretary refused, refrained or neglected to protect the Indian's interest.

*Jackson v. Sims*, 201 F.2d 259, 262 (10th Cir. 1953).

Finally, defendants contend that *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649 (D.Me.), *aff'd*, 528 F.2d 370 (1st Cir. 1975), compels a dismissal here. Defendants assert that *Passa-*

*maquoddy* requires a "*judicially*-initiated effort asking that the United States act on the plaintiffs' behalf" as "a prerequisite to any suit alleging noncompliance with the *Nonintercourse Act*." Defendant County of Madison's Post-Trial Memorandum 9. This suggested reading of *Passamaquoddy* lacks support in the facts. It appears to be a case of the wish being father to the thought.

> Whether, even if there is a trust relationship with the Passamaquoddies, the United States has an affirmative duty to sue Maine on the Tribe's behalf is a separate issue that was not raised or decided below and which consequently we do not address.

*Passamaquoddy, supra*, 528 F.2d at 375. Nor was the right of the tribe to litigate without the intervention of the United States at issue because of the apparent immunity of Maine to suit. *Passamaquoddy* definitely did not require a suit against the United States as a prerequisite to a tribe's suit under the Nonintercourse Act.

Two actions similar to the instant one, both brought in the First Circuit, have found that *Passamaquoddy* did not hold the United States to be an indispensable party. *Mashpee Tribe v. New Seabury Corp.*, 427 F.Supp. 899 (D.Mass.1977); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.*, 418 F.Supp. 798 (D.R.I.1976).

## IX. THE STATE OF NEW YORK IS NOT AN INDISPENSABLE PARTY

Defendants contend that the action must be dismissed for failure to join the State of New York as an indispensable party. Defendants argue that, as counties, they hold land only as agents of the State. They further argue that an action against the counties will be binding on the State under the law of agent and principal—thus

---

**40.** Nor need the United States be joined in an action against third persons by certain Indian nations to establish title to and to recover possession of land constituting part of the unallotted common domain of the nations, or

in an action by an Indian tribe to quiet title to lands claimed under a treaty with the United States.

3A *J. Moore, Federal Practice*, ¶ 19.09[8] at 2325 (2d Ed. 1974) (footnotes omitted).

making the State an indispensable party and requiring the dismissal of the suit. The first premise of this argument, however, is faulty and with that faulty foundation removed, the argument collapses.

New York County Law empowers a county's Board of Supervisors to "acquire by purchase or condemnation and accept by gift real . . . property for lawful county purposes." *N. Y. County Law* § 215(3). The county is permitted to lease such property (*Id.*), build upon it (*Id.*), and "sell and convey all the right, title and interest of the county therein." *Id.* § 215(5). Nothing in the statutes limits the extent of the county's title nor specifies that the county holds property as an agent for the State. Neither do any of the cases cited by defendants state that counties in New York hold title to land as agents of the State. *Village of Kenmore v. Erie County*, 252 N.Y. 437, 169 N.E. 637 (1930) (statute requiring counties to collect taxes for villages struck down as violative of state constitutional provision forbidding counties from incurring debts); *Village of Croton-on-Hudson v. County of Westchester*, 38 A.D.2d 979, 331 N.Y.S.2d 883 (2d Dep't.), *aff'd*, 30 N.Y.2d 959, 335 N.Y.S.2d 825, 287 N.E.2d 617 (1972) (county enjoined from diverting parkland to use as a dump without legislative authorization). One case cited by defendants stated, by way of dicta, that a "county is a mere agent of the State." *County of Cayuga v. McHugh*, 4 N.Y.2d 609, 614, 176 N.Y.S.2d 643, 647, 152 N.E.2d 73, 76 (1958). However, the New York Court of Appeals added that counties, as political subdivisions, have "no power save that deputed to them by [the State Legislature]." *Id.* The language of § 215 of the County Law is clear enough—the

State has authorized counties to acquire lands, to hold title to these lands, and to use or dispose of them, within certain limits. *N. Y. County Law* § 215. *See also Cooke v. Mulligan*, 81 Misc.2d 1025, 1026–27, 367 N.Y.S.2d 204, 206 (Sup.Ct.1975).[41]

*Ward v. Louisiana Wild Life and Fisheries Commission*, 224 F.Supp. 252 (E.D.La. 1963), *aff'd*, 347 F.2d 234 (5th Cir. 1965), cited by defendants, is inapposite. There, the state was the record owner of the land in question. That land had originally been deeded to the Louisiana Board of Commissioners for the Protection of Birds, Game and Fish. A subsequent statute transferred the land to the State of Louisiana.

Since the defendants are the record owners of the land involved in this suit, and since they hold this land in their own right and not as agents for the State, the State need not be joined. Fed.R.Civ.P. 19(a). Complete relief can be accorded among the present parties; the State cannot be prejudiced in any way by its absence; nor does the State's absence subject any of the parties to possible multiple liabilities. Dismissal under Fed.R.Civ.P. 19(b) is not required. *Mashpee Tribe v. New Seabury Corp.*, 427 F.Supp. 899 (D.Mass.1977).

Defendants concede that the Eleventh Amendment does not insulate them from suit. They argue that the suit must be dismissed against them, however, because the State cannot be made a party defendant by reason of the Eleventh Amendment. Having already determined that it is not necessary to make the State a party defendant, it is equally unnecessary to consider any argument based on the Eleventh Amendment.[42]

---

**41.** All of the properties involved here had already been acquired by Albany County as the result of previously held tax sales—most, if not all, of which were conducted long before the plaintiff was elected to office. As such they must be considered county properties and the County owns them proprietorially and can continue to hold them, sell them or lease them pursuant to the provisions of County Law § 215, or otherwise dispose of them at such times and upon such terms as shall be determined by the County Legisla-

ture, with or without advertising for bids, subject only to ultimate approval by a majority vote of that body.
*Cooke v. Mulligan*, 81 Misc.2d 1025, 1026–27, 367 N.Y.S.2d 204, 206. (Sup.Ct.1975).

**42.** In any event, equity and good conscience, as in the case of the United States, would militate against dismissal. Fed.R.Civ.P. 19(b). The State is no more an indispensable party than any other person in the chain of title.

## X. FORM OF THE ACTION

Casting about among the old common law forms of action for a label with which to tag the claim in this action, the defendants state, "it is difficult to characterize the nature of the plaintiffs' action." Defendant County of Madison's Post-Trial Memorandum 26. They find the most appropriate to be either the old common law "action for use and occupancy" or "an action for wrongful desseisin" or one "of trespass for mesne profits." The defendants then argue with some force that the complaint does not allege all of the essential elements required for any of these actions. *See Crawford v. Town of Hamburg,* 19 A.D.2d 100, 101, 241 N.Y.S.2d 357, 359 (4th Dep't. 1963); *Kelman v. Wilen,* 283 App.Div. 1113, 131 N.Y. S.2d 679, 680 (2d Dep't. 1954); *see generally* 28 C.J.S. *Ejectment* § 132 (1941); 91 C.J.S. *Use and Occupation* § 3 (1955). There is no need to consider the pleading question posed by this argument. As I said in the initial decision considering the jurisdictional question, "[n]o purpose would be served trying to tack a name on the cause of action asserted." *Oneida Indian Nation v. County of Oneida,* 70–CV–35, slip op. at 3 (N.D. N.Y., November 9, 1971).

To start with, the precise form of this action, which would have been so important at common law, is no longer determinative of the action's outcome. Under the Federal Rules of Civil Procedure, the question is not how plaintiffs have characterized the action, but whether plaintiffs are entitled to relief. "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Fed.R.Civ.P. 54(c). *See generally* 6 *J. Moore, Federal Practice* ¶ 54.62 (2d Ed. 1976); *10 C. Wright and A. Miller, Federal Practice and Procedure* § 2664 (1973).

[It] is of no importance at the present time to consider whether the plaintiff's remedy is by replevin, trover, money had and received, or trespass. The real question is whether, under the facts disclosed in the complaint, the plaintiff is entitled to relief. If he is, the court can apply the proper remedy, [under] Rule 54(c) . . ..

*Commonwealth Trust Co. of Pittsburgh v. Reconstruction Finance Corp.,* 28 F.Supp. 586, 588 (W.D.Pa.1939). *See also Herzog & Straus v. GRT Corp.,* 553 F.2d 789, 791 n.2 (2d Cir. 1977).

Neither can the defendants derive comfort from their contention that the plaintiffs' complaint and proof failed to meet the requirement of state law. "There being no federal statute making the statutory or decisional law of the State of New York applicable to the reservations, the controlling law remained federal law . . .." *Oneida Indian Nation, supra,* 414 U.S. at 674, 94 S.Ct. at 781. Referring to the Indian tribes' right of occupancy, the Supreme Court pointed out that such right "sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. . . . [T]hese tribal rights to Indian lands became the exclusive province of the federal law." *Id.* at 667, 94 S.Ct. at 777. Thus, it is of little import that the plaintiffs failed to establish the elements of a state-based cause of action. *United States v. Forness,* 125 F.2d 928 (2d Cir.), *cert. denied,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942) (Seneca Indian Nation suit not barred by failure to comply with state law).[43]

**43.** In *United States v. Forness,* 125 F.2d 928 (2d Cir.), *cert. denied,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942), the Seneca Indian Nation sued to cancel a 99 year lease of a portion of its land. Defendant lessees first argued that the suit should be dismissed since they had tendered the rent as New York law requires. The Second Circuit refused to apply New York Law. *Id.* at 932. Defendants also argued that, according to the common law, the remedy of cancellation was unavailable because plaintiffs had not made a demand for the rent. The court rejected this argument and declined to be bound by "ancient doctrine." *Id.* at 937

It follows that we are here at liberty to apply legal rules as to landlord and tenant which comport with the Congressional intent concerning the Senecas.

*Id.* at 938. The Court of Appeals ultimately remanded the case to the district court for entry of judgment in favor of plaintiffs, on the condition that plaintiffs' offer for a new lease at a more reasonable rent be kept open. *Id.* at 943.

The plaintiffs have established a claim for violation of the Nonintercourse Act. Unless the act is to be rendered nugatory, it must be concluded that the plaintiffs' right of occupancy and possession to the land in question[44] was not alienated. By the deed of 1795, the State acquired no rights against the plaintiffs; consequently, its successors, the defendant counties, are in no better position.

In this phase of the trial, the only question to be determined is that of liability.[45] The extent of the liability and the manner in which the relief is to be fashioned remain for another day. *Cf. Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

This Memorandum-Decision and Order shall constitute the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

The court having jurisdiction of the subject matter and the parties hereto, for the reasons herein, it is

ORDERED, that the issue of liability be and it hereby is decided in favor of the plaintiffs and against the defendants; and it is further

ORDERED, ADJUDGED AND DECREED that the defendants be and they hereby are held liable to the plaintiffs by reason of said defendants' occupancy of the land in question during the years 1968 and 1969, all other issues to be determined in a subsequent trial.

The parties have indicated a need for, and the circumstances would seem to compel an appeal from this Order. However, the determination herein does not constitute a final judgment or a judgment which could appropriately be certified for entry as a final judgment pursuant to Rule 54(b), Fed.R.Civ.P. *Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); *United States v. Southern Pacific Transportation Co.,* 543 F.2d 676, 681 n.5 (9th Cir. 1976). Therefore, pursuant to 28 U.S.C. § 1292(b), I hereby

certify that in my opinion the within Order involves a controlling question of law, i. e. whether a violation of the Nonintercourse Act in 1795 gives rise to a claim against the present record owners of a portion of the involved land. I further certify that an immediate appeal from the Order may materially advance the termination of this and other litigation held in abeyance pending the determination of the issue herein. *See* Rule 5, Fed.R.App.P.

---

**44.** The parties have stipulated that defendants are record owners of part of the land transferred in 1795. (Tr. 6).

**45.** *See* note 11 and accompanying text *supra.*